In re TELEDYNE DEFENSE CON-TRACTING DERIVATIVE LITI-GATION.

No. CV 92–6481 Kn.

United States District Court, C.D. Calif.

Aug. 16, 1993.

Order Dismissing Federal Claims with Prejudice Sept. 27, 1993.

William S. Lerach, Milberg Weiss Bershad Specthrie & Lerach, San Diego, CA, Kevin P. Roddy, Los Angeles, CA, Richard Schiffrin, Schiffrin & Craig, Ltd., Bala Cynwyd, PA, Co–Lead Counsel, Eugene Mikolajczyk, J. Paul Gignac, Chimicles, Burt & Jacobsen, Los Angeles, CA, Richard D. Greenfield, Greenfield & Rifkin, Haverford, PA, Howard B. Sirota, Saul Roffe, Sirota & Sirota, New York City, for plaintiffs.

Thomas E. Holliday, Barbara G. Zelkind, Gibson, Dunn & Crutcher, David I. Gindler, Irell & Manella, Miles N. Ruthberg, Heller, Ehrman, White & McAuliffe, Los Angeles, CA, Brian C. Cuff, Carlsmith Ball Wichman Murray Case Mukai & Ichiki, Long Beach, CA, William J. Meeske, Latham & Watkins, Los Angeles, CA, for defendants.

### MEMORANDUM OPINION ON DEFENDANTS' MOTIONS TO DISMISS

KENYON, District Judge.

### I. INTRODUCTION

This is a shareholders derivative action brought pursuant to Fed.R.Civ.P. 23.1 by

shareholders of Nominal Defendant Teledyne, Inc. (the "Corporation"). This action is brought in the name of and for the benefit of the Corporation against its Board of Directors, as well as certain of its present and/or former officers. The Second Amended Complaint ("SAC") alleges a continuous course of illegal conduct in which all Defendants have participated directly, as part of a conspiracy and/or by aiding and abetting one another.

Specifically, the SAC describes a pattern of criminal and otherwise fraudulent conduct by several of the Corporation's subsidiaries and units, including: (1) the sale of between 9 and 12 million suspect or defective electromagnetic switches (known as relays) by Teledyne Relays to the United States government over a period of years, resulting in various civil and criminal investigations, charges, and complaints, including a False Claims Act lawsuit pending before this Court and a guilty plea (including a $17.5 million fine) by the Corporation to federal criminal charges of 35 counts of making false statements to the government; (2) charges against Teledyne Systems alleging the submission of inflated prices when bidding for government contracts, which has resulted in a False Claims Act lawsuit for some $90 million in damages (and in which, as with the Teledyne Relays suit, the government has intervened) and a related criminal investigation; (3) a False Claims Act lawsuit and related criminal investigation against Teledyne Controls, alleging inadequate testing on cockpit instrument systems used in military aircraft, averring damages of some $300 million, and for which the Corporation has already paid $2.15 million in partial settlement; (4) whistle-blower actions involving the Teledyne Electronics Unit, alleging bribery to obtain foreign contracts, and the Teledyne Solid–State Unit, the subject matter of which is unknown; (5) admission of Teledyne Electronics, Teledyne Firth Sterling, Teledyne Electro–Mechanisms, and Teledyne Thermatics into the Department of Defense Voluntary Disclosure Program, resulting in disclosure of military transponder production discrepancies and failures to conform to requirements of various government testing programs and military specifications; and, (6) the execution of federal search warrants on, and the receipt of federal grand jury subpoenas by, several of the Corporation's other divisions.

Plaintiffs bring four separate claims, two federal, two state: (1) claimed violations of RICO, 18 U.S.C. § 1962(a)–(d), are brought against all Defendants; (2) claimed violations of § 14(a) of the Securities Exchange Act and SEC Rule 14a–9 are brought against the Officer and Director Defendants only; common law claims for (3) intentional breach of fiduciary duties and aiding and abetting the same; and, (4) negligent breach of fiduciary duties, are brought against all Defendants. Plaintiffs seek (a) to recover (on the Corporation's behalf) the damages alleged to have been caused by the corporation's illegal activities and the Defendants' participation or acquiescence therein; (b) return to the Corporation of salaries and other compensation paid and given to the Defendants during the time when the Defendants were in breach of the fiduciary duties they owed to the Corporation; (c) a declaration that the elections of the Directors from 1987 to 1992 are null and void; and, (d) costs and expenses, including attorneys', accountants', and experts' fees.

The various Defendants (including the "Inside Directors," the "Outside Directors," the "Officer Defendants," and Defendant Thomas L. McDowell) have moved to dismiss each and every cause of action in the SAC pursuant to Fed.R.Civ.P. 12(b)(6). Although the Defendants ask this Court to dismiss Plaintiffs' complaint on a variety of grounds, the Court limits its discussion and decision to two issues. The first appears to be a question of first impression: is a parent corporation (or its shareholders suing derivatively) a proper RICO plaintiff when the racketeering activity complained of was conducted by and through its corporate subsidiaries, directed at third parties (primarily the United States government), and intended for the overall benefit of the Corporation (and its shareholders)? The second question is one about which much has been written: assuming that the officers and directors were somehow culpably involved in the pattern of unlawful conduct alleged, do they violate Section 14(a) of the Exchange Act by failing to confess their involvement prior to the commencement of any litigation questioning that in-

volvement? Because the Court answers these two questions in the negative, Plaintiffs fail to state a viable federal claim, and this lawsuit, including the pendent state law claims, must be dismissed. The Court need not and does not reach the alternative arguments raised.

## II. *ANALYSIS*

■ For purposes of a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the Court assumes the truth of all of the allegations in the complaint and views the averments in the light most favorable to the Plaintiffs. Leave to amend is ordinarily granted unless the Court concludes beyond doubt that the Plaintiffs can allege no set of facts consistent with their complaint that would entitle them to relief. *Schreiber Dist. v. Serv–Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir.1986).

### A. *RICO CLAIMS*
#### 1. *Background*

Plaintiffs purport to state claims under all of RICO's substantive provisions (i.e., 18 U.S.C. § 1962(a)–(d)). Under § 1964, any person "injured in his business or property by reason of a violation of" any of these subsections may bring suit therefor. Drawing on prior interpretation of similar wording in the antitrust laws, the Supreme Court recently held that this "by reason of" language requires that RICO plaintiffs show proximate causation, one aspect of which is a "direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Securities Investor Protection Corp.*, —— U.S. ——, ——, 112 S.Ct. 1311, 1318, 117 L.Ed.2d 532 (1992). "Thus, a plaintiff who complains of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts [is] generally said to stand at too remote a distance to recover." *Id.*

■ The Ninth Circuit recently adopted the position previously taken by this and other courts that to state a § 1962(a) claim, Plaintiffs must allege injury "by reason of" the Defendants' use or investment of racketeering income. *Nugget Hydroelectric v. Pacific Gas · & Elec.*, 981 F.2d 429, 437 (9th

Cir.1992). This Court has similarly agreed with courts that have held that a § 1962(b) claim requires injury "by reason of" Defendants' "acquisition or control of an interest in a RICO enterprise." *E.g., U.S. Concord, Inc. v. Harris Graphics Corp.*, 757 F.Supp. 1053, 1060 (N.D.Cal.1991). To state a § 1962(c) claim, one must allege an injury "flow[ing] from the commission of the predicate acts." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985); *Reddy v. Litton Industries, Inc.*, 912 F.2d 291, 294 (9th Cir.1990). § 1962(d), which makes actionable conspiracy to violate any one of the three previous provisions, imports the injury-violation nexus of each. *See Medallion TV Enterprises v. SelecTV of California*, 627 F.Supp. 1290, 1297–1301 (C.D.Cal.1986), *affirmed* 833 F.2d 1360 (9th Cir.1987); *Reddy*, 912 F.2d at 294–295.

#### 2. *Pleading Injury and Causation*

■ Defendants' principal argument for dismissal of Plaintiffs' RICO claims is that under *Holmes*, the racketeering activity complained of was not the proximate cause of the injuries to the Corporation for which Plaintiffs seek recovery. Put another way, Defendants argue that Plaintiffs lack "statutory standing." *Holmes*, —— U.S. at ——, 112 S.Ct. at 1327 (Scalia, J., concurring) (noting that proximate causality is one element of RICO statutory standing).

■ Defendants point out that according to the SAC the Corporation was the immediate beneficiary of the alleged wrongdoing (e.g., it retained defense contracts it might not otherwise have gotten, and thereby inflated its earnings and profits); the governments of the United States (and Saudi Arabia and Egypt) were the intended targets; and, any injury the Corporation suffered (decreased profits because of payment of fines, penalties, legal fees, and investigation costs, exposure to massive potential liability, and decreased sales to the government, *see* SAC ¶¶ 8, 39, 116, 126) resulted not directly from the RICO violations alleged, but from revelation of the predicate acts and the government's independent decisions to investigate the complaints brought to its attention.[1]

---

1. Plaintiffs also allege injury to the Company's "business reputation." SAC ¶ 126. However, injury to such an intangible property interest is not cognizable under RICO in this circuit. *Oscar v. University Students Co-op Ass'n.*, 965 F.2d 783, 785 (9th Cir.1992) (en banc).

Plaintiffs do not respond to the arguments made by Defendants that the SAC does not state a claim under 1962(a) and 1962(b) because nowhere is it alleged that the injuries complained of were caused or "by reason of," respectively, the use or investment of racketeering income, or Defendants' acquisition or control of an interest in a RICO enterprise. While failure to respond to an argument may be deemed consent to ruling against the non-opposing party, *see* Local Rule 7.9, even the most liberal reading of the SAC reveals that these arguments are meritorious.

In the "damages" section of the SAC, the Plaintiffs allege damages in the form of expenditures of significant sums of money "as a result of the improper pursuit and retention of defense contracts and other fraudulent and illegal actions described above." ¶ 116. Earlier in the SAC, Plaintiffs describe in great detail the illicit activity carried on by the various Teledyne subsidiaries, ¶¶ 2–7, and then allege that "[a]s a result of the foregoing pattern of illegal and wrongful conduct, Teledyne has been damaged in that," inter alia: (a) it pled guilty to criminal charges and paid a $17.5 million fine; (b) its divisions have been and remain subject to other government sanctions, including contract suspension and disbarment; (c) it faces multi-billion dollar exposure from the pending whistle-blower suits; (d) it has been forced to pay large sums of money for legal and other costs to defend itself against the various lawsuits and on-going investigations; (e) its goodwill and corporate name have suffered irreparable harm. ¶ 8. Most importantly, Plaintiffs' RICO claim contains only an extremely general and conclusory averment as to the specific causation requirements of each RICO subsection:

As a direct and proximate result of Defendants' activities in violation of § 1962(a), (b), (c), and (d) of RICO ... Teledyne has been injured in its business or property because it has suffered the loss of substantial amounts of sales and profits and has been exposed to potential liability, including massive claims for consequential, treble and punitive damages, has incurred damage to its business reputation and has expended and will continue to expend millions of dollars for fines, costs, expenses and legal fees in connection with the Defendants' unlawful acts.

SAC ¶ 126.

The Court finds that as to the requirement of pleading injury by reason of the violations of § 1962(a) and § 1962(b), Plaintiffs' allegations are "general, conclusory, and vague," and therefore do not state claims under these two subsections. *Nugget Hydroelectric*, 981 F.2d at 437–38; *see also U.S. Concord, Inc.,* 757 F.Supp. at 1060. There is simply no averment or explanation of how the damages described were caused "by reason of" either Defendants' use or investment of racketeering income or Defendants' acquisition or control of an interest in the RICO enterprise. *Imagineering, Inc. v. Kiewit Pacific Co.,* 976 F.2d 1303, 1311 (9th Cir.1992) (RICO violation must be "but for" as well as "proximate" cause of injuries complained of). Instead, viewing the allegations in the light most favorable to the Plaintiffs, the only theory of injury stated in the SAC is that the damages incurred by the Corporation are attributable (in both a "but for" and "proximate" causation sense) to the alleged predicate acts of racketeering—mail and wire fraud, false claims, bribery, and illegal proxy statements—and their revelation, investigation, and prosecution by third parties. Accordingly, the § 1962(a) and (b) claims are DISMISSED, and the Court moves on to consider whether Plaintiffs state a § 1962(c) claim, which requires only a showing of injury "by reason of" the predicate acts.

### 3. *§ 1962(c) Claim*

■ If the injuries to the Corporation are understood to be indirect, or, more precisely, derivative of the injuries to the directly harmed parties, Plaintiffs' RICO claim is barred on proximate causation/standing grounds, *even if* the harm to the Corporation was foreseeable. This result is made clear by the Supreme Court's decision in *Holmes*, and the Ninth Circuit's application of *Holmes* in *Imagineering, Inc. v. Kiewit Pac. Co.,* 976 F.2d 1303 (9th Cir.1992).

In *Imagineering*, the court labelled the prime contractors' "intervening inability ... to secure the contracts" as the direct and proximate cause of the subcontractor/Plaintiffs' injuries. 976 F.2d at 1312. This char-

acterization echoed the Supreme Court's statement in *Holmes* that it was the contingent "intervening insolvency" of the broker-dealers that caused injury to the investors and triggered SIPC's duty to pay. —— U.S. at ——, 112 S.Ct. at 1319. As in *Holmes* and *Imagineering*, a persuasive argument can be made that in the instant case Plaintiffs lack RICO standing because the harms to the Corporation were most directly caused by some identifiable intervening fact, i.e., the independent decisions of the whistle-blowers and the government to initiate and prosecute the violations committed. In fact, in comparison to *Imagineering* in particular, the instant case is weaker for Plaintiffs on the proximate causation issue. In *Imagineering*, the plaintiffs/sub-contractors had already signed up to do work for the primary contractors; thus, when the primary contractors lost out on contracts, the subcontractors necessarily and foreseeably suffered a loss of their already allocated share of that work as well. Here, however, had the whistle not been blown repeatedly on the wrongful conduct by the Teledyne subsidiaries, not only would harm not have been done to the Corporation, but the Corporation would have benefitted handsomely.

Two of the three policy considerations informing the standing analysis of the *Holmes* majority, borrowed directly from antitrust decisions, also suggest that Plaintiffs herein are not proper RICO complainants. First is the fact that suits by less directly injured parties such as Plaintiffs herein raise problems of speculative damages and damages that are difficult to attribute to the violations complained of (as opposed to other independent factors). *Holmes*, —— U.S. at ——, 112 S.Ct. at 1318. It is of course true that the Corporation has incurred costs related to certain aspects of the alleged racketeering scheme. However, before it was exposed and apprehended, the Corporation presumably also received substantial benefits. The overall impact on the Corporation, therefore, will depend on how accurately those involved with the illegal activity weighed the likely gains of their behavior against the possible costs (including the costs of getting caught), and on how successful the Corporation is in avoiding further exposure and in defending the civil suits pending against it. At the very

least, determining this bottom line would require this Court to engage in the very sort of complicated and speculative damages questions which the statutory standing doctrine has been designed and interpreted to avoid. *See* II Areeda and Turner, *Antitrust Law,* ¶ 336e at p. 182 (1978) (explaining that antitrust law does not and should not confer on derivative plaintiffs standing to complain of antitrust violations intended to benefit their own corporation because the very "fact" of damage to the corporation is open to question).

Moreover, while the injury to the government, e.g., is easily attributed to the Corporation's wrongful conduct, there are independent factors in the chain of causation that may be partially, even significantly, responsible for the translation of fraud, etc. *perpetrated by* the Corporation into injury *suffered by* the Corporation. Such factors could include what Plaintiffs have characterized as the Corporation's less than forthright or responsible reaction to the initial exposure of its illegal behavior, lack of managerial or director oversight, failure on the part of responsible Corporate officials to take proper remedial steps once corporate wrongdoing was brought to light, or, insufficient or inadequate defense of the Corporation against the charges levied against it. Of course, to the extent the Corporation's harm was caused or exacerbated by mismanagement, Plaintiffs have an adequate remedy in state law fiduciary duty doctrines.

The deterrence aspect of tort laws in general, and of the treble damage provisions of the antitrust and RICO laws in particular, also suggests that it is unnecessary, and possibly unwise, to confer standing beyond the direct, intended, and necessary victims. The courts have recognized that directly injured parties make for the best private attorneys generals because they have the most access to the information necessary to uncover violations, information that may be hidden from or inaccessible to others further removed. *Holmes*, —— U.S. at ——, 112 S.Ct. at 1318; *Carter v. Berger,* 777 F.2d 1173, 1176, 1777 (7th Cir.1985). Therefore, the "existence of identifiable persons more obviously suffering ... injury whose self-interest would motivate

them to vindicate the public interest in anti-trust" or RICO enforcement generally weighs against conferring statutory standing on those who suffer less directly and obviously. *R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*, 890 F.2d 139, 148 (9th Cir.1989) (en banc); *id.* at 161 (Norris, dissenting in part).

Here, however, Plaintiffs seek the benefits that RICO confers on the private attorney general (treble damages), without having made the contribution which RICO and other similar statutes contemplate: detection and disclosure of the statutory violations. As Defendants note, in bringing the instant complaint Plaintiffs here have merely "cribbed" (1) from the various qui tam and other lawsuits filed against the Corporation by the "identifiable" and "more obviously injured" category of persons and entities mentioned above, and (2) from other publicly available information. By simply stringing together a series of facts established or revealed by others, and drawing an inference that the named Defendants must have been involved in or are somehow legally responsible for the wrongs that have occurred, Plaintiffs contribute little if anything to the goal of exposing and ending the infiltration and conduct of legitimate and illegitimate business by racketeers. Indeed, when, as here, the corporate misconduct is intended to benefit the corporation, this is likely always to be the case: Plaintiffs' incentive to seek vindication of the law arises only *after* the Corporation's wrongdoing has been revealed. Unless and until discovered by others, Plaintiffs' interests are served, not harmed, by any corporate wrongdoing that inures to the Corporation's benefit (assuming the wrongdoers have calculated correctly).[2]

### 4. *Plaintiffs' Argument*

Without addressing themselves to any of these issues, Plaintiffs merely assert that foreseeability of injury is enough so long as there is a direct relationship between the injury suffered and the wrongful conduct alleged, citing *Standardbred Owners Ass'n v. Roosevelt Raceway Assoc., L.P.*, 985 F.2d

102, 104 (2d Cir.1993). Plaintiffs' reliance on *Standardbred*, however, is misplaced. The RICO violations alleged in *Standardbred* described "a pattern of direct misrepresentations to plaintiffs." *Id.* Here, of course, the RICO violations were directed toward the government and were intended to benefit the Corporation. In addition to this factual dissimilarity, the Second Circuit's application of *Holmes* in *Standardbred* appears to be at odds with the Ninth Circuit's opinion in *Imagineering*.

Although the Second Circuit clearly has rejected foreseeability alone as sufficient to satisfy RICO's proximate causation requirement, *Sperber v. Boesky*, 849 F.2d 60, 65–66 (2d Cir.1988) (foreseeability "proves too much" and "alone does not determine proximate cause"), in *Standardbred* it continued to apply the pre-*Holmes* test of proximate cause announced in *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23–24 (2d Cir.1990). That test asks "whether the defendant's acts 'are a substantial factor in the sequence of responsible causation,' and whether 'the injury is reasonably foreseeable or anticipated as a natural consequence.' " *Id.*

This *Hecht* test is difficult to reconcile with the language and especially the outcome of *Imagineering*, and this Court's decision is of course controlled by the latter. The *Imagineering* opinion goes to some length to explain that "but for" causation and "foreseeability" are not necessarily sufficient to establish proximate cause under *Holmes.* 976 F.2d at 1312. More than this, while the subcontractors in *Imagineering* might reasonably invoke the language of *Standardbred* to the effect that "an injury to the [contractors] was inevitably an injury to them," as already explained, the harms allegedly incurred by the Corporation herein were unintended and far from inevitable, and in any event, the Ninth Circuit has clearly held that such "inevitability" is not necessarily enough under *Holmes.*

---

**2.** As will be suggested repeatedly, a derivative action would be much more appropriate if by their racketeering activity the defendants are alleged to have looted the corporation for their own benefit. In that situation, the corporation and its shareholders are the obvious, intended, and primary victims. They have the proper access and incentives to serve as, and may appropriately reap the benefits of, a RICO private attorney general.

Plaintiffs' failure to so argue notwithstanding, reliance on comparisons to the facts or policy concerns underlying *Holmes* and *Imagineering* is not entirely satisfactory. *Holmes* and *Imagineering* and other derivative injury cases operate on the presumption that it is proper and best that the directly injured party recover in full for all damages caused by the wrongdoers, and that the parties injured only secondarily, that is, only because of their relationship with the direct victim, look to share in the direct victim's recovery for their own compensation. *Holmes,* —— U.S. at ——, 112 S.Ct. at 1321 (secondary victims must "wait on the outcome of the [direct victim's] suit" and may share in the proceeds if that suit is successful); *see also Carter v. Berger,* 777 F.2d 1173, 1176 (7th Cir.1985).

Here, however, the Corporation can not expect that the directly injured party—the United States or the qui tam Plaintiffs—will share their recoveries (e.g., fines related to criminal guilty pleas or statutory damages from the qui tam actions). From the perspectives of these victims, the Corporation is the wrongdoer and no distinction is made between the shareholders (who own the Corporation and are the Plaintiffs here) and the officers, directors, and employees (who run the Corporation and are the Defendants here). More than this, none of these directly injured parties would be entitled to (or interested in) recovering for other aspects of the alleged damage to the Corporation, including attorneys fees, investigation costs, or lost opportunities to contract with the government. In short, the concern articulated in *Holmes* and echoed in *Imagineering*—that allowing indirectly injured parties to sue would involve Courts in "complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries" (—— U.S. at ——, 112 S.Ct. at 1318; 976 F.2d at 1312)—is not as clearly implicated here. And, to the extent the racketeering activities complained of caused injury beyond damage incurred by the direct and intended victims, denying standing to the less directly victimized might undercut the deterrent purposes of the RICO statute because the wrongdoers could get away with causing more damage than they may be made to pay for (or, more precisely, more than they are made to pay for trebly under RICO).

### 5. *Further Policy Considerations*

#### a. *Target Area Approach*

The line of RICO cases employing a "target area" analysis illustrates the importance of the fact that the Corporation was the intended beneficiary and the unintended victim of the alleged RICO violations. *See* 2 Mathews, Weissman, & Sturc, *Civil RICO Litigation* § 8.04[C][3] at 8–74 (2d Ed.1992).[3] The "target area" approach was adopted implicitly by this Circuit in a pre-*Holmes* decision, *Reddy v. Litton Industries, Inc.,* 912 F.2d 291 (9th Cir.1990). In *Reddy,* the Ninth Circuit followed the unanimous lead of the other circuits and held that "an employee who is wrongfully discharged for refusing to participate in an alleged pattern of racketeering activity lacks standing to sue under § 1962(c)" because "the injury he suffered was the result of his alleged wrongful termination and was not caused by the predicate acts." *Id.* at 294.

The "target area" approach—even if broadly defined to include "not just the immediate victims of the predicate acts, but also any other persons whose injury is an intended and necessary consequence of the conduct" (*Civil RICO Litigation* at 8–91)—rules out Plaintiffs claims here. Succinctly stated, there can be no credible argument that the Corporation was the intended target or necessary victim of the wrongful conduct alleged.

#### b. *Zone of Interests*

Justice Scalia, concurring in *Holmes,* noted that "another element of statutory standing

---

**3.** Although the "target area" approach was criticized in *Associated General Contractors v. California State Council of Carpenters,* 459 U.S. 519, 536 n. 33, 103 S.Ct. 897, 907–908 n. 33, 74 L.Ed.2d 723 (1983), intent remains an important consideration under *Associated General Contractors* and its progeny. *R.C. Dick Geothermal Corp.*

*v. Thermogenics, Inc.,* 890 F.2d 139, 146, 157 (9th Cir.1989) (en banc). In so far as the *Holmes* decision suggested by example the propriety of borrowing from this line of cases, intent remains a relevant, albeit not dispositive, consideration in the RICO context as well.

is compliance with ... the 'zone of interests' test, which seeks to determine whether, apart from the directness of the injury, the plaintiff is within the class of persons sought to be benefitted by that statute at issue." — U.S. at ——, 112 S.Ct. at 1328. Here, it is far from clear that RICO was intended to protect corporate owners (shareholders) from harm arising out of corporate wrongdoing intended to benefit the corporation, and in particular from the participation or acquiescence of the directors and officers whom the shareholders have elected and whom they may remove through traditional corporate state law provisions. And to the extent statutory standing analysis is informed by and varies according to the underlying predicate acts of which Plaintiffs complain, *see Holmes*, — U.S. at ——, 112 S.Ct. at 1328 (Scalia, concurring). Plaintiffs herein would not have standing to complain of mail and wire fraud in the form of false claims submitted to the government, bribery directed at the government and in violation of 18 U.S.C. Sec. 201, or interstate transportation of money or property obtained through fraud in violation of 18 U.S.C. Sec. 2314. *See* SAC par. 124.[4]

If RICO was intended to protect certain entities or classes of persons from an enterprise such as the one here alleged, particularly in light of the predicate acts that underlie Plaintiffs' RICO claim, that group is properly limited to the government and those of the Corporation's competitors which might have been wrongfully denied their share of the business that the Corporation fraudulently obtained. *Sperber v. Boesky*, 849 F.2d 60, 64–65 (2d Cir.1988) (relying on Justice Marshall's dissent in *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 521–522, 105 S.Ct. 3275, 3302–3303, 87 L.Ed.2d 346 (1985), for the proposition that proper RICO plaintiffs include the target, the competitor, and the

customer of the racketeers, as well as the " 'honest investor' who is displaced by the racketeer who wrests 'control of a legitimate business' through racketeering"); *U.S. Concord, Inc.*, 757 F.Supp. at 1060 & n. 12. In the instant case the government has decided to vindicate its interests under different federal statutes (although it is not inconceivable that a RICO claim will be brought by the government at some later date), and, as far as the Court is aware, the Corporation's competitors have not sought redress through the Courts at all.[5] But that is no reason to allow Plaintiffs to bring a cause of action that belongs in the first instance to these more direct victims of the alleged RICO enterprise. *See* 18 U.S.C. §§ 1964(b), (c) (Attorney General may bring suit under RICO, as well as any entity injured "by reason of a [RICO] violation").

### c. *RICO and Intra–Corporate Relations*

Also persuasive is the idea that RICO was not intended to federalize *internal* corporate relationships. If the Corporation and its shareholders were in fact injured by the alleged actions or inaction of the Defendants, they are free to pursue traditional breach of fiduciary duty corporate remedies under state law. Plaintiffs' third and fourth claims are in fact for common law breaches of fiduciary duty. And, as noted above, state corporate law uniformly provides a framework for removal of officers and directors.

The wrongs complained of here were done by corporate directors, officers, or employees, acting on "behalf" of the Corporation, and therefore their wrongs must be considered wrongs perpetrated by the Corporation itself. A derivative action is brought on a corporation's behalf, alleges causes of action that belong to the corporation, and ultimately benefits the corporate owners—the shareholders (usually including, as here, the di-

---

4. Plaintiffs also claim that the mail fraud predicate acts included sending false and misleading proxy statements to shareholders. However, as will be discussed, the Court herein finds as a matter of law that the proxy statements did not violate Section 14(a) of the Exchange Act.

5. In denying the subcontractor Plaintiffs standing in *Imagineering*, the Court recognized that the contractors who might have been awarded the projects absent the Defendant's fraud on the

government would have RICO standing. Indeed, the vast majority of RICO decisions have conferred standing on competitors injured by RICO activity that might be said to have targeted or to have been directed towards the government. *See Civil RICO Litigation*, Sec. 8.04[C][3][b][i] at 8–81—8–85 (noting that such decisions are justified because in enacting RICO, Congress clearly "envisioned a civil remedy for injury to businesses commercially disadvantaged by the criminal operations of their competitors").

rectors and officers). It is simply illogical to allow a suit to go forward when it is brought in the name and on behalf of a corporation and seeks to recover for damages flowing from wrongful acts (or, more precisely, from the discovery of those acts) which the law understands as having been committed by the corporation (and purportedly for its benefit). *Cf. Cenco Inc. v. Seidman & Seidman,* 686 F.2d 449, 456 (7th Cir.), *cert. denied,* 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982) ("Fraud on behalf of a corporation is not the same thing as fraud against it. Fraud against the corporation usually hurts just the corporation; the stockholders are the principal if not only victims.... But the stockholders of a corporation whose officers commit fraud for the benefit of the corporation are beneficiaries of the fraud. Maybe not net beneficiaries, after the corporation is unmasked and the corporation is sued.... But the primary costs of a fraud on the corporation's behalf are borne not by the stockholders but by outsiders to the corporation, and the stockholders should not be allowed to escape all responsibility for such a fraud....").[6] It is worth noting that this exact category of derivative suit emphatically has been rejected by the leading antitrust commentators for many of the same reasons

outlined above. II Areeda and Turner, *Antitrust Law,* ¶ 336e at p. 182 (1978).[7]

### 6. *The Result*

Proximate causation, as an element of statutory standing, is one of the few legal principles that courts openly confess is guided by "normative legal policy considerations" reflecting " 'ideas of what justice demands, or of what is administratively possible and convenient.' " *Hecht,* 897 F.2d at 23; *Holmes,* —— U.S. at ——, 112 S.Ct. at 1318. No one consideration is dispositive, and in the end the Court is called on to balance the relevant factors and make a judgment call.

Reading the complaint in the light most favorable to the Plaintiffs, and accepting all allegations as true, the Court finds that there are few if any compelling reasons to confer RICO standing on Plaintiffs in this case. On the other hand, as explained in detail in the preceding pages, virtually every test at this Court's disposal for grappling with the elusive questions of proximate causation and statutory standing suggests that the RICO sword is not properly wielded in an action by shareholders such as Plaintiffs seeking to clean their own corporate house. Plaintiffs' § 1962(c) claim is therefore **DISMISSED.** The Court has already dismissed Plaintiffs'

---

**6.** *Cenco* represents an application of Illinois state law tort principles, and in a later case arising under RICO, the Seventh Circuit declined to follow it, in part for this reason. *Schacht v. Brown,* 711 F.2d 1343, 1347 (7th Cir.1983). However, Judge Posner's reasoning retains much of its force in the instant factual setting: the *Schacht* opinion quoted this same passage distinguishing fraud on behalf of a corporation from fraud against it, and acknowledged that the *Cenco* estoppel analysis still retains its force in cases where, like here, " 'the managers are not stealing from the company ... but instead are turning the company into an engine of theft against outsiders.' " *Id.* (quoting *Cenco,* 686 F.2d at 454). The *Schacht* Court declined to follow *Cenco* because unlike *Cenco* (and unlike the case before this Court), the effect of the illegal scheme in the case before it was that the corporation was "fraudulently continued in business past its point of insolvency and systematically looted of its most profitable and least risky business and more than $3,000,000 in income...." *Id.* at 1347–1348.

**7.** "The plaintiff's corporation may itself be engaged in an antitrust violation. Presumably, the corporation's management and directors are acting in the corporation's interest when they volun-

tarily engage in an arguably unlawful merger, predatory pricing, or a price-fixing conspiracy with rivals. The corporation, directly or derivatively, may not have an antitrust action against the officers responsible for the violation.... It may seem strange that a shareholder could not invoke antitrust jurisdiction to enjoin his own corporation from violating federal law. But the regulation of dealings within the corporation is best left to state law. Allowing a derivative action under federal law ... creates an embarrassment of fact and principle. The very fact of damage would be in doubt. If management had correctly calculated the gains for the corporation relative to potential liabilities to outsiders, the corporation would have profited from the violation. Of course, the judgment might have been erroneous. And, to be sure, the resulting doubt about damage might be resolved in favor of liability in order to vindicate the public policy against violations of the antitrust laws. But that is the rationale of punishment, not compensation, especially when treble damages are to be awarded to the corporation. In principle, moreover, one may wonder whether antitrust law is the appropriate vehicle for controlling the relationships between a corporation and its shareholders or officers. Those relationships can be adequately controlled by state law."

§ 1962(a) and (b) claims. Accordingly, Plaintiffs' § 1962(d) conspiracy claim must be **DISMISSED** as well.

The Court does not believe that Plaintiffs will be able to state a viable RICO claim under any theory consistent with the facts alleged and this Court's explication of the controlling legal principles. Accordingly, Plaintiffs are **ORDERED TO SHOW CAUSE** within twenty-one (21) days of the signing of this Order why the RICO claims should not be **DISMISSED WITH PREJUDICE.** Defendants may respond within fourteen (14) days of the filing and receipt of Plaintiffs' arguments should they wish to do so. The matter will then stand submitted.

### B. Securities Exchange Act Claims
#### 1. Background

Plaintiffs bring a claim under § 14(a) of the Exchange Act seeking invalidation of the Corporation's elections for the Board of Directors. The Plaintiffs allege that the Director Defendants repeatedly secured their spots on the Board by distributing misleading proxy materials that failed to disclose "the extent and nature of the nominees' participation, aiding and abetting and/or willful acquiescence in the [defense contracting] wrongdoing referred to herein including, in particular, the continuing cover-up of fraudulent and illegal Government contract activities." SAC ¶ 132. More specifically, Plaintiffs aver:

> The Proxy Materials were false and misleading in seeking and obtaining the election of the Company's directors for the period from 1987 to 1992 without disclosing (a) Defendants' repeated illegal acts and violations of law, including the Teledyne Relays Electromagnetic Relays Scheme, the Teledyne Systems Contract Government Fraud Scheme, the IFF False Testing Scheme, the Teledyne S.A. Egyptian Bribery Scheme, the Teledyne Controls Fraudulent Scheme and the Teledyne Wah Chang Albany Illegal Export Scheme described [in the preceding paragraphs of] this Second Amended Complaint.; (b) that the Officer and Director Defendants had violated the law in a manner which would subject the Company to huge fines and other penalties as well as other damages complained of herein; and (c) that the Officer and Director Defendants participated in the wrongdoing complained of herein in order to continue and prolong the illusion of Teledyne's success as a leader in the defense industry, to inflate the price of the Company's common stock, and to conceal the adverse facts concerning Teledyne's illegal conduct, management and future prospects so that they could (1) protect and perpetuate their directoral (and, for the Officer Defendants, their Executive) positions so as to continue their receipt of the substantial compensation, power and prestige they obtained thereby, and (2) inflate the price of Teledyne common stock in order to enhance the value of their security holdings and options.

SAC ¶ 133. Plaintiffs claim that "[s]uch information with respect to the Director Defendants' business practices, honesty and integrity was and is material and integral to an informed exercise of the suffrage process, particularly the election of directors." Id. ¶ 134.

■ Three things must be noted at the outset. First, Plaintiffs refer somewhat misleadingly to "Defendants' repeated illegal acts." To the extent this paragraph suggests that the alleged proxy omissions concerned illegal activities of persons other than the Defendants herein (e.g., by persons acting on behalf of the Corporation's subsidiaries), such omissions are obviously not material to the fitness of the Defendants to serve as officers and directors. It is only to the extent that these Defendants can be said to have been personally involved in or guilty of the illegal conduct that a claim of an omission material to their election may be stated.

■ Second, as Defendants point out, as currently pled Plaintiffs' § 14(a) claim is moot because it is based on proxy statements relating to director terms which expired in April of this year. General Elec. Co. by Levit . v. Cathcart, 980 F.2d 927, 934 (3d Cir.1992) ("challenges to the election of directors for lapsed terms are moot") (collecting cases). However, Plaintiffs state that they intend to seek leave to amend to include the April 28, 1993 proxies which (1) resulted in the re-election of all director defendants and (2) allegedly failed to disclose any of the

facts upon which Plaintiffs' § 14(a) claim is premised. Moreover, the Sec. 14(a) claims also appear to be included as RICO predicate acts. Accordingly, it is appropriate for the Court to decide whether, if amended as offered, Plaintiffs would state a viable claim.

Third—and relevant only to the question of whether leave to amend for the reason referred to above is appropriately granted—the Court notes that the proxy statement issued in connection with April 28, 1993 election of the Corporation's directors discloses the pendency of the instant lawsuit (as well as others) and explains quite specifically that the directors and officers of the Corporation are named as Defendants, that they are charged with violations of RICO, the Securities and Exchange Act of 1934, and breaches of fiduciary duty, and that the Plaintiffs seek from them treble the damages sustained by the Corporation and annulment of the directors' elections from 1987 through 1992. Russell Decl., Exh. A at 20–21. The proxy statement also refers to the Corporation's 10–K Annual Report of December 31, 1992, which describes all of the involved lawsuits in more detail. *Id.*, Exh. B at 4–6.

2. *Materiality and the Gaines Distinction*

From a common sense standpoint, Plaintiffs are surely correct: had the Director Defendants confessed the wrongdoing of which Plaintiffs herein accuse them, it is not difficult to imagine that the shareholders might have cast their electoral ballots differently. Such information also appears to fall within the definition of materiality set forth by the Supreme Court: an omitted fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).

However, relying on *Gaines v. Haughton*, 645 F.2d 761 (9th Cir.1981), *cert. denied*, 454 U.S. 1145, 102 S.Ct. 1006, 71 L.Ed.2d 297 (1982), Defendants argue that the omission of the sort of information adverted to by Plaintiffs is simply not a material omission actionable under § 14(a). The *Gaines* court framed the issue this way:

Gaines' § 14(a) claim is ultimately premised on appellees' failure to disclose 'corrupt and improper payments' and related corporate misconduct to the Lockheed shareholders in the proxy solicitation materials for director elections.... The real issue in this appeal is whether, and in what circumstances, management's failure to disclose particular conduct to the shareholders states a § 14(a) cause of action. *Id.* at 774. In answering this question, the Court "dr[e]w a sharp distinction between allegations of director misconduct involving breach of trust or self-dealing—the non-disclosure of which is presumptively material—and allegations of simple breach of fiduciary duty/waste of corporate assets—the nondisclosure of which is never material for § 14(a) purposes." *Id.* at 776–777.

Absent credible allegations of self-dealing by the directors or dishonesty or deceit which inures to the direct, personal benefit of the directors ... we hold that director misconduct of the type traditionally regulated by state corporate law need not be disclosed in proxy solicitations for director elections. This type of mismanagement, unadorned by self-dealing, is simply not material or otherwise within the ambit of the federal securities laws.

*Id.* at 779.

Defendants argue that under *Gaines*, Plaintiffs' 14(a) claim must fail because Plaintiffs "have not alleged, nor could they, any self-dealing by the directors or dishonesty or deceit which inured to their direct, personal benefit." Indeed, it is fairly clear that if Defendants are guilty of participating or acquiescing in the illegal conduct that went on at the Corporation's subsidiaries, any such involvement was intended to benefit (not harm) the Corporation, and only inured to the personal advantage of the Defendants to the extent that the Corporation prospered because of its ill-gotten gains.

Plaintiffs argue contrarily that their § 14(a) claim "falls within the *Gaines* parameters by detailing defendants' intentional failure to disclose numerous criminal violations in order to: (1) protect and perpetuate their director positions; (2) inflate the price of Teledyne common stock so as to enhance the value of their security holdings and options; and (3) avoid potential personal criminal lia-

bility" (citing SAC ¶¶ 32, 34, 133). Plaintiffs argue that under the *TSC* definition of materiality, "the particularized allegations of the complaint, which detail widespread criminal acts, are material."

The trouble with Plaintiffs' argument is that it blurs the critical distinction drawn in *Gaines* between simple corporate mismanagement (which inures to the detriment of the corporation and its directors equally) and self-dealing (which inures to the detriment of the corporation but to the benefit of the self-dealer). Any time directors' complicity in illegal conduct carried out for the corporations's ostensible benefit is omitted from election proxies, the directors benefit in the ways suggested by Plaintiffs: the Directors retain their position, they put off disclosure of their own criminal conduct, and they sustain the inflated value of the stock they almost always own in the corporation. Indeed, as in the instant case, the directors in *Gaines* were alleged to be complicit in the illegal activity averred, 645 F.2d at 765 n. 5, and thus by Plaintiffs' reasoning they too might have been said to have personally benefitted.

But the Court in *Gaines* concluded otherwise, leaving Plaintiffs to state corporate law remedies for claims of mismanagement in the absence of allegations that the director Defendants' conduct or omissions inured to their "direct personal benefit." In so holding the Ninth Circuit explicitly took exception to the refusal of the Second Circuit to adopt and apply the "self-dealing/simple mismanagement dichotomy" in *Weisberg v. Coastal States Gas Corp.,* 609 F.2d 650 (2d Cir.1979). The Ninth Circuit clearly stated its belief that "[t]he distinction between 'mere' bribes and bribes coupled with kickbacks to the director makes a great deal of sense, indeed, is fundamental to a meaningful concept of materiality under § 14(a) and the preservation of state corporate law." 645 F.2d at 777–778.

Therefore, in this circuit, "credible allegations of self-dealing ... or dishonesty or deceit which inures to the direct, personal benefit of the directors" are absolute prereq-

uisites to § 14(b) claims of material omissions in election proxies. *Id.* at 779. Plaintiffs here have not made such allegations as *Gaines* requires. And as in *Gaines,* the remedy Plaintiffs seek here—annulment of the most recent election (or removal) of the directors—is readily attainable through more traditional state law corporate remedies. *See* Del.Corp.Code §§ 141(d), (k); Cal.Corp. Code §§ 303, 304.[8]

### 3. Confessions of Wrongdoing

The *Gaines* court did recognize that "[t]here are clearly instances of illegal conduct by director-nominees, unrelated to self-dealing, ... which would have to be disclosed, especially if they involved criminal convictions," and therefore "limited [its holding] to existing directors' duty under § 14(a) to disclose *non-criminal conduct* in proxy solicitations for their re-election." 645 F.2d at 777 n. 24. *Accord Amalgamated Clothing v. J.P. Stevens & Co.,* 475 F.Supp. 328, 331 (SDNY 1979), *vacated as moot,* 638 F.2d 7 (2d Cir.1980) (declining to read *Maldonado v. Flynn,* 597 F.2d 789 (2d Cir.1979), on which the *Gaines* court relied, "as meaning that instances of illegal or immoral conduct are never required to be included in proxy materials unless they relate to self-dealing").

However, the cases and SEC regulations cited in support of a duty to disclose illegal conduct of persons seeking election to director positions suggest no more than a duty to disclose: (1) "pending litigation in which a nominee for the board has an interest adverse to that of the corporation," (2) litigation "filed against a nominee under federal bankruptcy or state insolvency law," (3) litigation that "has resulted in a criminal conviction of the nominee or involves pending criminal charges," (4) litigation which resulted in the suspension of the nominee "from participating in certain specified securities related professional activities," or (5) litigation in which "the nominee was found to have violated state or federal securities law." *Cathcart,* 980 F.2d at 936–937 (discussing applicable

---

8. Cal.Corp.Code § 304 shows why it is utterly unnecessary to federalize the removal of directors. That statute authorizes suit in Superior Court by shareholders holding at least 10% of the outstanding shares to "remove from office any

director in case of fraudulent or dishonest acts or gross abuse of authority or discretion with reference to the corporation." Such a suit may also result in a bar to reelection of any director so removed. *Id.*

**1382**

SEC regulations[9]); *Cooke v. Teleprompter Corp.*, 334 F.Supp. 467 (SDNY 1971) (Plaintiffs sought removal of corporate director and officer found guilty of conspiracy to bribe, bribery, and perjury); *Chris–Craft Industries, Inc. v. Independent Stock Com.*, 354 F.Supp. 895, 912 (D.Del.1973) (failure to disclose that board member was "involved with bad check charges," "had been charged as a fugitive from justice," and "had a purported drunken driving conviction," constituted a "material omission violative of Rule 14a–9"); *SEC v. Freeman*, [1978] Fed.Sec.L.Rep. (CCH) ¶ 96,361 at 93,244 (N.D.Ill.1978) (failure to disclose indictment for violations of federal securities laws and court finding of fraud in sale of franchises is actionable omission in conjunction with sale of securities); *Rafael v. Geneen*, [1972–1973] Fed.Sec. L.Rep. (CCH) ¶ 93,505 (E.D.Pa.1972) ("failure to report that three proposed members of the Board of Directors are defendants in at least one [lawsuit alleging violations of federal securities laws] is clearly a defect related to the transaction for which approval is sought and an omission which certainly might be considered important by a reasonable shareholder who is in the process of deciding how to vote.").[10]

 As noted above, the directors have now satisfied these disclosure standards: the most recent proxy statements fully reveal the pendency and substance of the instant and other related lawsuits against the Corporation's directors. Directors and officers simply need not confess guilt to involvement in criminal conduct and breaches of fiduciary duties of care when such charges have not yet been brought, let alone proven. *Ciresi v. Citicorp*, 782 F.Supp. 819, 823 (SDNY 1991) (dismissing § 14(a) claim in part because "the law does not impose a duty to disclose uncharged, unadjudicated wrongdoing or mismanagement"), *affirmed*, 956 F.2d 1161 (2d Cir.1992).[11]

 As Judge Leval convincingly explained in *Amalgamated Clothing*, "the proxy rules simply do not require management to accuse itself of antisocial or illegal policies." 475 F.Supp. at 330. Judge Leval argued that such disclosure was not required "not because shareholders would not be interested in such information," but instead because, as the drafters of the disclosure requirements recognized, such a rule "would *not* promote increased disclosure [and] would serve only to support vexatious litigation and abusive discovery." *Id.* (noting that SEC regulations *do not* require "disclosure of illegal intentions or even of crimes committed which have not been the subject of legal proceedings").

Courts have applied the general principle articulated by Judge Leval in dismissing § 14(a) claims that nominees for director elections should have revealed, e.g., "contested, unproven, and unpursued allegations of a complaint filed in an unrelated intra-family dispute," *GAF Corp. v. Heyman*, 724 F.2d 727, 738–739 (2d Cir.1983); that they were the subject of a grand jury investigation

---

**9.** " 'Schedule 14a sets minimum disclosure standards. Compliance with this schedule does not necessarily guarantee that a proxy statement satisfied Rule 14a–9,' " *Zell v. Intercapital Income Sec., Inc.*, 675 F.2d 1041, 1044 (9th Cir.1982) (quoting *Maldonado*, 597 F.2d at 796 n. 9). However, the schedule is "persuasive authority as to the required scope of disclosure in proxy materials" as it provides the SEC's " 'expert view of the types of involvement in legal proceedings that are most likely to be matters of concern to shareholders....' " *Cathcart*, supra, 980 F.2d at 937 (quoting *GAF Corp. v. Heyman*, 724 F.2d 727, 739 (2d Cir.1983)).

**10.** There are decisions holding that non-disclosure of wrong-doing by corporate officers could be material within the meaning of the securities laws. *E.g.*, *Roeder v. Alpha Industries, Inc.*, 814 F.2d 22, 24–26 (1st Cir.1987) (failure to disclose alleged bribery by corporate officials, even before

criminal indictment became imminent, may be a material omission under Rule 10b–5); *Ballan v. Wilfred American Educational Corp.*, 720 F.Supp. 241, 248–250 (E.D.N.Y.1989). However, such cases appear to be limited to non-election contexts, and application of the rules announced therein to the case at bar would be contrary to *Gaines*, because like *Gaines*, these cases and the instant case do not involve directoral self-dealing.

**11.** Plaintiffs argue that *Ciresi* is inapposite because it involved "uncharged, unadjudicated wrongdoing." Plaintiffs direct the Court to compare ¶¶ 2–8 of the SAC. However, all these paragraphs amount to are descriptions of established wrongdoing and criminal conduct by *others*, and mere allegations of the Defendants' participation or acquiescence therein. Therefore, *Ciresi* is directly on point.

involving allegations of bribery and conspiracy related to the corporation's activities, *United States v. Matthews*, 787 F.2d 38, 49 (2d Cir.1986); that they had received a "target letter" in conjunction with a criminal investigation, where no indictment resulted and the investigation was no longer pending, *In Re Browning–Ferris Industries, Inc. Shareholder Derivative Litigation*, 1993 WL 126311 (S.D.Tex. Feb. 25 1993); or, "mere allegations as to illegal conduct and mismanagement by [ ] officers and directors." *Bolger v. First State Financial Services*, 759 F.Supp. 182, 194 (D.N.J.1991).

The wisdom of limiting disclosure to pending or adjudicated actions is evident in the instant factual and procedural setting. Because this is a motion to dismiss, the Court must assume that what Plaintiffs allege—i.e., Defendants' involvement in the criminal conduct of the Teledyne subsidiaries—is true. However, the fact remains that Defendants will presumably deny, and neither Plaintiffs nor anyone else has yet proven, that the Defendants had any culpable involvement which they might have been obligated to disclose. Put another way, § 14(b) requires disclosure of material facts, and the Defendants' culpability—under the case law and the SEC regulations—does not become a fact that must be disclosed until it is at least charged (in which case the charge is material) or proven (in which case the proven conduct is material).

### 5. *Conclusion*

Plaintiffs' securities fraud claim is moot and is therefore properly **DISMISSED.** Plaintiffs' § 20(a) claim alleges control person liability for the alleged violations of § 14(a). Because no § 14(a) claim is stated, the § 20(a) claim is also **DISMISSED.**

Plaintiffs have offered to amend to cure the mootness problem by incorporating the most recent director elections. As the Court

has explained, even with such an amendment Plaintiffs would not state a viable claim under § 14(a). Indeed, the Court does not believe that Plaintiffs will be able to state a viable § 14(a) claim under any theory consistent with the facts alleged and this Court's explication of the controlling legal principles. Accordingly, Plaintiffs are **ORDERED TO SHOW CAUSE** within twenty-one (21) days of the signing of this Order why the securities fraud claims should not be **DISMISSED WITH PREJUDICE.** Defendants may respond within fourteen (14) days of the filing and receipt of Plaintiffs' arguments should they wish to do so. The matter will then stand submitted.

### C. *State Law Breach of Fiduciary Duty Claims*

Plaintiffs offer no response to the arguments of the Defendants that: (1) Plaintiffs' claim for negligent breach of fiduciary duty against the Directors is barred by the Corporation's Certificate of Incorporation (of which this Court may take judicial notice), 2) Cal. Corp.Code §§ 2255 and 1507 are improper bases for an intentional breach of fiduciary duty claim, and (3) Delaware's three year statute of limitations for actions seeking money damages bars the state law claims to the extent they are based on events occurring prior to February 23, 1990.[12]

However, because the only federal claims are being dismissed at this early stage of the litigation, Plaintiffs' state law claims are **DISMISSED WITHOUT PREJUDICE** to Plaintiffs re filing them in state court. Plaintiffs' counsel is urged carefully to consider the arguments put forth by Defendants before re-filing the state law claims in state Court.

IT IS SO ORDERED.

---

**12.** Without permission of this Court, Plaintiffs filed two thirty page briefs in opposition to the Defendants' motions. The state law claims are mentioned only in a footnote in one of these briefs, wherein Plaintiffs announce that they will "answer defendants' arguments that the Complaint does not state a claim for intentional and negligent breach of fiduciary duty" in the course of establishing why pre-suit demand was futile because of the Directors' participation in the wrongdoing alleged. *See* Demand Utility and State Law Claims Brief at p. 14 n. 8. The lengthy discussion that follows, however, merely recites case law discussing the fiduciary duties of directors in the most general of terms. Other than discussing what must be plead to state a breach of fiduciary duty claim, Plaintiffs simply do not address any of the Defendants' other specific objections to the state law claims.

ORDER DISMISSING FEDERAL
CLAIMS WITH PREJUDICE

The Court has reviewed the papers submitted in response to the order to show cause why the two federal claims should not be dismissed with prejudice. Plaintiffs are silent as to their securities fraud claims and therefore these claims are **DISMISSED WITH PREJUDICE.** As to the RICO claims, other than taking issue with the Court's analysis of the law, Plaintiff offer to do little more than amend their complaint to specifically state that the injuries to Teledyne were "foreseeable." As the Court has already explained, foreseeability alone is not enough. Plaintiffs' citation to the dissenting opinion in *Oscar v. University Students Co-Op Ass'n.*, 965 F.2d 783, 799 (9th Cir.1992) (en banc) does not convince the Court otherwise, as even there the three dissenting judges spoke in terms of the harm being not just a "foreseeable" result of the alleged racketeering activity but also a "necessary" result. The Court is fully aware of the fact that "but for" the wrongdoing at various levels of the Teledyne entities, the company would not have been forced to pay out the very real fines, penalties, and other fees that have resulted from the discovery and prosecution of this illegal conduct. However, the law is clear that "but for" causation alone is inadequate to confer RICO standing. For these reasons, and for the reasons stated in this Court's previous decision, it is clear to the Court that leave to amend is unwarranted, and therefore Plaintiffs' RICO claims are also **DISMISSED WITH PREJUDICE.**

IT IS SO ORDERED.