39 F.3d 395
 RICO Bus.Disp.Guide 8688
 In re AMERICAN EXPRESS COMPANY SHAREHOLDER LITIGATION.
Harry LEWIS, derivatively on behalf of American Express
Company; Charles W. Hayden, derivatively on behalf of
American Express Company; Andy Grey, derivatively on behalf
of American Express Company; Lewis D. Gilbert; and John
Gilbert, Plaintiffs-Appellants,
v.
James D. ROBINSON; Harry L. Freeman; Robert F. Smith;
Susan Cantor; Anne L. Armstrong; William G. Bowen; David
M. Culver; Charles W. Duncan, Jr.; George M.C. Fisher;
Richard M. Furlaud; Beverly Sills Greenough; F. Ross
Johnson; Vernon E. Jordan; Fred M. Kirby; Henry A.
Kissinger; Drew Lewis; Aldo Papone; Roger S. Penske;
Frank P. Popoff; Robert V. Roosa; Rawleigh Warner, Jr.;
Joseph H. Williams; Louis V. Gerstner, Jr., Defendants-Appellees,
Peter A. Cohen, Defendant,
American Express Company, Nominal Defendant.
 No. 1743, Docket 94-7131.
 United States Court of Appeals,
Second Circuit.
 Argued June 20, 1994.
Decided Nov. 1, 1994.
 
 Edward Labaton, Melvyn I. Weiss, New York City (Bernard Persky, Madeleine Plasencia, Goodkind Labaton Rudoff & Sucharow, Robert P. Sugarman, Lee S. Shalov, Paul D. Young, Milberg Weiss Bershad Hynes & Lerach, Fred Taylor Isquith, Lawrence P. Kolker, Wolf, Haldenstein, Adler, Freeman & Herz, New York City, Kenneth A. Jacobsen, Ira Neil Richards, Chimicles, Jacobsen & Tikellis, Mark C. Rifkin, Greenfield & Rifkin, Haverford, PA, Bradford J. Lam, Levin Fishbein Sedran & Berman, Philadelphia, PA, of counsel), for plaintiffs-appellants.
 Arthur L. Liman, New York City (Mark A. Belnick, Claudia L. Hammerman, Paul, Weiss, Rifkind, Wharton & Garrison, of counsel), for Director defendants-appellees.
 Grant Herring, New York City (John J. Walsh, Steven J. Selby, Cadwalader, Wickersham & Taft, of counsel), for defendant-appellee Freeman.
 Steven M. Stimell, New York City (Robinson Silverman Pearce Aronsohn & Berman, of counsel), for defendant-appellee Cantor.
 Before: WINTER, MINER and MAHONEY, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 Harry Lewis and five other shareholders of American Express Company appeal from Judge Leisure's dismissal of their shareholder derivative action against certain present and former directors, officers, and employees of American Express 840 F.Supp. 260. The complaint alleged that the defendants violated Section 14(a) of the Securities Act of 1934, 15 U.S.C. Sec. 78n(a) (1988), Sections 1962(c) and (d) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. Sec. 1961 et seq. (1988), and various fiduciary obligations under state law. The district court dismissed the two federal claims pursuant to Fed.R.Civ.P. 12(b)(6) and then declined to exercise its supplemental jurisdiction over the state law claims. See DiLaura v. Power Authority, 982 F.2d 73, 80 (2d Cir.1992).
 
 
 2
 On appeal, appellants have abandoned their securities fraud claim and argue only that the district court erred in dismissing their RICO and common law claims. In the alternative, appellants contend that the district court erred in dismissing the complaint without granting them leave to replead. Because we agree with the district court that appellants' allegations failed to satisfy RICO's proximate cause requirement, and because the district court did not abuse its discretion in denying leave to replead, we affirm the district court's dismissal of the complaint.
 
 BACKGROUND
 
 3
 Appellants' complaint alleges a tale of international intrigue in which top-level officers of one of this country's preeminent corporations conspired with shady overseas operatives, greedy journalists, and corrupt foreign politicians in a scheme to defame a rival by falsely linking him to organized crime, Columbian drug trafficking, and the Iran-Contra affair. In reviewing a dismissal under Fed.R.Civ.P. 12(b)(6), we of course assume these allegations to be true. See Allen v. WestPoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir.1991).
 
 
 4
 In 1983, American Express purchased Trade Development Bank ("TDB"), an international bank headquartered in Geneva, Switzerland and founded by Edmond J. Safra, an international banker and financier. As part of the acquisition, Safra agreed to a five-year employment contract with American Express that made Safra an American Express Vice Chairman and a member of the company's Board of Directors. Safra obligated himself also not to compete with American Express in banking, insurance, and brokerage services until March 1, 1988.
 
 
 5
 Safra, however, soon became disillusioned with James D. Robinson, III, American Express's Chairman of the Board and CEO. Frustrated by Robinson's "general disregard of his input and counsel," Safra in 1984 negotiated a severance agreement with American Express. As part of this agreement, Safra returned to Geneva, reaffirmed his prior non-compete agreement, "and agreed to additional non-competition covenants also to expire on March 1, 1988."
 
 
 6
 After leaving American Express, Safra began plans to open a new Swiss bank--Safra Republic Holdings S.A.--when the non-compete agreements expired. (Safra had earlier founded Republic National Bank, an institution with a "worldwide reputation for quality and excellence.").
 
 According to the complaint:
 
 7
 The prospects of a new Safra-controlled bank based in Switzerland alarmed American Express executives, particularly Robinson and [Robert F.] Smith [then chairman of American Express Bank]. In their view, a competing Swiss bank, especially one operated and controlled by Safra, could cause injury to the already floundering American Express Bank. Fearing their inability to compete legitimately with Safra and Republic, Robinson, [Harry L.] Freeman [then Executive Vice President for Corporate Affairs and Communications of American Express, and Robinson's "right-hand man"], and Smith sought to protect themselves from further public embarrassment through a calculated plan of disinformation and deception.
 
 
 8
 Robinson and Smith initiated a campaign to sabotage Safra's application for a Swiss banking license. In furtherance of this campaign, Robinson and Smith directed American Express employees to investigate, among other things, whether Safra had been misappropriating American Express employees who had previously worked for Safra at TDB and whether he had violated United States tax laws. American Express also formally opposed Safra's application for the bank license on the grounds that Safra had violated his non-compete agreement.
 
 
 9
 Meanwhile, again according to the complaint, "an illegal and criminal scheme was being devised by the highest ranking senior executives of American Express to defame and discredit Safra and Republic National Bank through the public dissemination of false, scandalous and malicious rumor and innuendo." After reading an erroneous report in the New York Times that a Safra jet had been used to carry U.S. officials to Iran to negotiate the release of American hostages, Freeman, who "perceived Safra as being bent on 'destroy[ing] TDB,' " began to probe for evidence of Safra's involvement in the Iran-Contra affair.
 
 
 10
 Joining Robinson, Smith, and Freeman in this scheme was Susan Cantor, an American Express employee and a former producer of television documentaries at ABC News. Cantor quickly established contact with a Swiss journalist probing an American lawyer allegedly involved with the Contras who also had ties to Safra. Cantor also attempted, unsuccessfully, to interest the House Select Committee investigating Iran-Contra in probing Safra's alleged involvement in the affair.
 
 
 11
 After further unsuccessful efforts to generate any evidence of wrongdoing by Safra and to plant anti-Safra articles in European periodicals, Cantor was put in contact with Antonio Giuseppe Greco, an experienced international investigator who had previously worked for American Express. After surreptitious meetings with Cantor in Nice and Barcelona, Greco agreed to assist in the investigation of Safra and Republic National Bank for a fee of $750 per day, plus expenses. Among Greco's goals was to provide law-enforcement authorities with enough supposed evidence of Safra's wrongdoing to generate a formal investigation of Safra, the existence of which Greco would then leak to journalists in order to "discredit Safra in the eyes of his depositors and the public generally."
 
 
 12
 On January 26, 1988, Safra's application for a Swiss banking license was granted. Shortly thereafter, Greco met Cantor in a New York coffee shop. At the meeting, Cantor offered Greco $500,000 on top of his current salary and expenses to facilitate the publication of news stories or articles with negative portrayals of Safra and/or Republic National Bank. Cantor also authorized Greco to offer journalists $10,000 for each anti-Safra article published.
 
 
 13
 Greco's efforts quickly met with success. In February 1988, Greco supplied Jacques Bertrand of the French newspaper La Depeche du Midi with the fruits of his investigation of Safra. On March 11, 1988, an article bearing Bertrand's by-line and sub-titled "Gangsters in White Collars" appeared in La Depeche du Midi. According to the complaint, "the article purported to link Safra to an organization of 'persons in white collars who call on professional killers for the elimination of nuisances....' "
 
 
 14
 Greco thereafter contacted a Peruvian government official, Victor Tirado, with whom he was socially acquainted. Through Tirado, Greco managed to plant articles in both Hoy, a Peruvian newspaper, and Uno Mas Uno, a Mexico City newspaper, linking Safra and Republic National Bank to organized crime, money laundering, and drug trafficking. Greco paid Tirado $18,000 for his efforts in getting the stories published. Greco also paid another Peruvian government official $30,000 to bribe other Peruvian journalists to publish anti-Safra articles. Greco regularly sent Cantor the anti-Safra articles he had managed to get published, and Cantor in turn passed the articles on to Freeman and Robinson.[1]
 
 
 15
 The scheme then began to unravel. Greco had caused a French reporter to publish a series of articles in Minute, a French newspaper, during the summer and fall of 1988 accusing Safra and Republic of participating in various criminal ventures, including money-laundering for Columbian drug lords. In October 1988, Safra filed the first of several criminal libel suits against Minute in the French courts. According to the complaint, all of these suits were "successful." In the course of the litigation, Minute disclosed many of the documents Greco had supplied Minute 's reporter. One of the documents turned over was a copy of a fax bearing American Express's fax tell-tale and dated February 25, 1988.
 
 
 16
 Safra subsequently confronted Robinson with the evidence of American Express's role in planting the series of defamatory articles. After initially denying American Express's involvement, Robinson capitulated. In July 1989 he issued a public apology to Safra and caused American Express to pay $8 million to charities of Safra's choosing. In a press release and a personal letter written to Safra, Robinson acknowledged the "untrue and defamatory" nature of the articles published.
 
 
 17
 Subsequent to this settlement, American Express's Board of Directors formed a committee of board members to investigate the wrongdoing. Although the committee hired prominent attorneys to head its inquiry, the complaint alleges that its investigation was inadequate. The committee interviewed only Freeman, Robinson, Smith, and Cantor, and conducted no investigation into the bribing of foreign journalists and officials despite Freeman's suggestion that such bribes had been paid. In addition, the only interview of Greco conducted by the attorneys was perfunctory.
 
 
 18
 Over the course of the scheme's existence, Greco's aggregate fees (including a $300,000 bonus authorized by Freeman and Robinson) totalled approximately $640,000. In addition, Greco was compensated for between $1.5 and $2 million in expenses.
 
 
 19
 Based on the foregoing events, the complaint charged that Freeman, Smith, and Cantor (the "RICO defendants") "have conspired to conduct and have conducted, directly or indirectly, the affairs of American Express and its divisions and subsidiaries through a pattern of racketeering activity, consisting of repeated acts of mail and wire fraud violative of 18 U.S.C. Secs. 1341 and 1343 and repeated acts of bribery" in violation of 18 U.S.C. Sec. 1962(c) and (d). The complaint's RICO count further alleged that the victims of the defamation scheme were Safra, Republic National Bank, and American Express. Finally, the complaint alleged that "as a proximate result of the defendants' illegal activities violative of RICO, 18 U.S.C. Secs. 1961-1968, [American Express] has been injured in its business and property in that it has suffered the loss of substantial amounts in sales and profits, has been exposed to potential liability, has incurred damage to its business reputation and goodwill, and has expended, and will continue to expend, large sums of costs, expenses and legal fees in connection with defendants' unlawful acts."
 
 
 20
 The district court dismissed plaintiffs-appellants' RICO claim for each of two independently sufficient reasons. First, the district court concluded that American Express's alleged injuries were not proximately caused by the RICO defendants' alleged RICO violations. Second, the court held that the complaint failed to adequately allege a "pattern of racketeering activity" under RICO. Because the district court also dismissed plaintiffs-appellants' Section 14(a) claim, it concluded that it would be appropriate to decline to exercise supplemental jurisdiction over the state law claims and therefore dismissed the complaint in its entirety without leave to replead. This appeal followed.
 
 DISCUSSION
 
 21
 Appellants confine their appeal to the dismissal of their RICO claim. Appellees assert that the judgment of the district court should be affirmed for the reasons relied on by the district court, as well as on five other grounds.[2] However, we need consider only appellees' contention that the injury to American Express was not proximately caused by the alleged acts of the RICO defendants.
 
 
 22
 RICO grants standing to sue to "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." 18 U.S.C. Sec. 1964(c) (1988) (emphasis added). This language limits standing to plaintiffs whose injuries were both factually and proximately caused by the alleged RICO violation. Holmes v. Securities Investor Protection Corp., --- U.S. ----, ---- - ----, 112 S.Ct. 1311, 1316-18, 117 L.Ed.2d 532 (1992); see also Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 23 (2d Cir.1990) ("By itself, factual causation (e.g., 'cause-in-fact' or 'but for' causation) is not sufficient."), Sperber v. Boesky, 849 F.2d 60, 63 (2d Cir.1988) (RICO "liability should not extend as far as factual causation").
 
 
 23
 Holmes described the common law proximate cause requirement as often taking the shape of a "direct relation between the injury asserted and the injurious conduct alleged." Holmes, --- U.S. at ----, 112 S.Ct. at 1318. The requirement of such a "direct relation" therefore generally precludes recovery by "a plaintiff who complain[s] of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts." Id.
 
 
 24
 Holmes essentially endorsed a definition of proximate cause that we had earlier adopted. See Hecht, 897 F.2d 21, 23-24; Burdick v. American Express Co., 865 F.2d 527, 529 (2d Cir.1989); Sperber, 849 F.2d at 64-65. In Sperber, plaintiffs were members of a class of investors who, before arbitrager Ivan Boesky pleaded guilty to insider trading, had purchased shares of stock in six public corporations in which Boesky also held interests. 849 F.2d at 62. Subsequent to Boesky's guilty plea, the share prices of the six stocks dropped by between 7% and 32%. The plaintiffs claimed that Boesky's pattern of insider trading violated RICO and that the insider trading was the proximate cause of their losses, because his ill-gotten reputation had artificially inflated the prices of the shares they had purchased. Id. Based on these facts, we concluded that the plaintiffs' injuries were not proximately caused by Boesky's insider trading, noting that the plaintiffs were "neither the target of the racketeering enterprise nor the competitors nor the customers of the racketeer." Id. at 64-65 (paraphrasing examples of plaintiffs with RICO standing listed in Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 521-22, 105 S.Ct. 3292, 3302-03, 87 L.Ed.2d 346 (1985) (Marshall, J., dissenting)); see also Hecht, 897 F.2d at 24 (using similar analysis).
 
 
 25
 In Hecht, we similarly held that an employee's loss of his job and of anticipated commissions because of his failure to aid or abet his employer's RICO violations were not proximately caused by the RICO violations. 897 F.2d at 22-24; see also Burdick, 865 F.2d at 529. Hecht described the proximate cause limitation as restricting liability to cases in which the RICO pattern or acts "are a substantial factor in the sequence of responsible causation, and ... the injury is reasonably foreseeable or anticipated as a natural consequence." 897 F.2d at 23-24.
 
 
 26
 Significantly, Hecht, a salesman for Commerce Clearing House ("CCH"), claimed that CCH customers' discovery of his employer's frauds had caused them to take their business elsewhere. This, he claimed, proximately caused the loss of commissions he otherwise would have earned from sales to the departed customers. That is, Hecht claimed that CCH's RICO scheme, even though not directed at him, had proximately caused his injury because exposure of the illegal scheme had resulted in his economic loss. Hecht rejected this theory of proximate causation and stated:
 
 
 27
 Because Hecht was 'neither the target of the racketeering enterprise nor the competitor[ ] nor the customer[ ] of the racketeer[s],' see Sperber, 849 F.2d at 65, the injury to Hecht from customers' deciding to cancel subscriptions or to withdraw business upon discovering the frauds was not reasonably foreseeable as a natural consequence of the RICO violations.
 
 
 28
 Hecht, 897 F.2d at 24.
 
 
 29
 At least one district court in this Circuit has applied Sperber and Hecht to a corporation's RICO claim against its agents for committing illegal actions ostensibly on the corporation's behalf. In In re Crazy Eddie Securities Litigation, 714 F.Supp. 1285 (E.D.N.Y.1989), Crazy Eddie, Inc. ("Crazy Eddie") asserted a RICO claim against certain former employees who, it alleged, had engaged in a pattern of securities fraud in order to artificially inflate Crazy Eddie's share price. Id. at 1290; see also Bernstein v. Crazy Eddie, Inc., 702 F.Supp. 962, 969 (E.D.N.Y.1988). Crazy Eddie claimed that the corporation was injured because its stock price dropped when the scheme was exposed and because it had been subjected to potential liability for the securities fraud. In re Crazy Eddie, 714 F.Supp. at 1290. Judge Nickerson noted that the RICO pattern and predicate acts were "directed not at Crazy Eddie but at the shareholders and the investing public." Id. at 1291. He thus held that because the scheme was intended to inflate the price of Crazy Eddie's stock and harmed Crazy Eddie only because it was publicly exposed, Crazy Eddie's injuries were not proximately caused by the alleged RICO violations. Id.
 
 
 30
 Appellants in the instant matter are in a situation similar to the plaintiffs in Hecht and Crazy Eddie. As was the case with regard to the employee in Hecht and the corporation in Crazy Eddie, the shareholders of American Express were certainly not the intended targets of the RICO violations. Quite the contrary, the RICO violations were intended to benefit American Express by injuring one of its competitors. And, again as in Hecht and Crazy Eddie, the commission of the RICO violations was not what injured American Express. Rather, it was the exposure of those acts that caused the appellants' harm.
 
 
 31
 Indeed, in their brief to this court, appellants describe Hecht as based on the rationale that the "whistle-blowing plaintiff's injury is not a preconceived purpose of the defendant nor is such an injury necessary in order to effectuate the RICO violation." Brief for the Appellants at 21. Appellants' purported distinction of Hecht is self-defeating. Any fair reading of the complaint in the instant case discloses that the RICO defendants' "preconceived purpose" was most assuredly not to cause some $10 million in losses to American Express. Instead, the complaint consistently alleges that the RICO defendants' actions, however misguided and injurious to American Express in the end, were undertaken to further American Express's competitive interests. Specifically, the complaint alleges that the RICO defendants undertook their scheme because "a competing Swiss bank, especially one operated and controlled by Safra, could cause injury to the already floundering American Express Bank," and because Robinson, Freeman, and Smith "[f]ear[ed] their inability to compete legitimately." Appellants' brief repeatedly characterizes the RICO defendants' scheme as "an illicit scheme to injure a potential major competitor of [American Express]." Brief for the Appellants at 16; see also id. at 4, 26-27.
 
 
 32
 The injuries alleged thus were neither the "preconceived purpose" nor the "specifically-intended consequence" of the RICO defendants' acts. Moreover, any losses to American Express were caused only because the scheme itself was exposed and thus failed. Therefore, the harm to American Express was neither the "necessary result" of the scheme nor more "foreseeable" than Hecht's loss of commissions when his employer's scheme was revealed.[3]
 
 
 33
 These cases have recognized that the RICO proximate cause analysis includes "normative legal policy considerations." Hecht, 897 F.2d at 23; see also Holmes, --- U.S. at ----, 112 S.Ct. at 1318; Sperber, 849 F.2d at 65 ("[D]octrine of proximate cause reflects social policy decisions."). In Holmes, the proximate cause analysis included the problem of apportioning damages and the need for additional deterrence of the alleged injurious conduct. --- U.S. at ----, 112 S.Ct. at 1318; see also First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 769-70 (2d Cir.1994).
 
 
 34
 The normative considerations that informed the proximate cause analysis in Holmes, Hecht, and Sperber weigh heavily in favor of not extending RICO standing to appellants. As in Holmes, the potential for duplicative recoveries created by granting standing to attenuated and indirect parties weighs against finding proximate causation. See Holmes, --- U.S. at ----, 112 S.Ct. at 1318. Such duplicative recoveries could well lead to, inter alia, superfluous deterrence. If appellants are correct that Freeman, Smith, and Cantor violated RICO by defaming Safra, then Safra, as the target and victim of the scheme, could sue Freeman, Smith, and Cantor under RICO and recover treble damages for injuries to his "business or property." See 18 U.S.C. Sec. 1964(c). Although the trebled damages in such an action would bear only an incidental relation to the corporation's injuries and (even though trebled) they might not equal the loss to the corporation, such potential liability to the directly injured victim does create a significant deterrent to engaging in a RICO scheme. Cf. Holmes, --- U.S. at ----, 112 S.Ct. at 1318 (need to recognize indirect standing "simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general"). Moreover, state law corporate waste or mismanagement claims, see, e.g., Seinfeld v. Robinson, et al., (Consolidated Action) Index No. 22304/90 (Sup.Ct., N.Y.Co.) (pending state court derivative action based on same allegations made here), already serve to discourage corporate managers from wasting corporate resources in ill-advised schemes such as the one alleged here.[4]
 
 
 35
 Nor do Ceribelli v. Elghanayan, 990 F.2d 62 (2d Cir.1993), or Standardbred Owners Association v. Roosevelt Raceway Associates, 985 F.2d 102 (2d Cir.1993), aid appellants. In each, we concluded that the complaint adequately alleged that the RICO violations proximately caused the plaintiffs' injuries. In both cases, however, the plaintiffs were the direct targets of the defendant's fraudulent schemes. See Ceribelli, 990 F.2d at 64, 65 n. 3; Standardbred, 985 F.2d at 104. That is not the case here.
 
 
 36
 Likewise unavailing is plaintiffs-appellants' reliance upon cases in which we dismissed RICO allegations where a shareholder sought to sue directly for a RICO injury to the corporation rather than proceeding through a derivative action. Manson v. Stacescu, 11 F.3d 1127, 1131-32 (2d Cir.1993), cert. denied, --- U.S. ----, 115 S.Ct. 292, 130 L.Ed.2d 206 (1994); Rand v. Anaconda-Ericsson, Inc., 794 F.2d 843, 849 (2d Cir.), cert. denied, 479 U.S. 987, 107 S.Ct. 579, 93 L.Ed.2d 582 (1986). These cases merely considered whether the claim should be brought by an individual shareholder or the corporation. Neither case considered the additional question of whether, had the action been properly brought as a derivative action, the corporation's injury would have been deemed proximately caused by the defendant's conduct.
 
 
 37
 Finally, appellants' claim that the district court erred in dismissing their complaint without granting leave to replead is meritless. We review the district court's decision not to grant leave to amend the complaint for an abuse of discretion. Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); Ruffolo v. Oppenheimer & Co., 987 F.2d 129, 131 (2d Cir.1993). Appellants amended their complaint twice before it was dismissed. Moreover, they did not seek leave to replead in the district court in their opposition papers to defendants' motion to dismiss, by way of a formal motion, or by way of a motion for reconsideration or to alter the judgment after the district court dismissed their claims. The district court surely did not abuse its discretion in not sua sponte granting leave to replead. See Confederate Memorial Ass'n, Inc. v. Hines, 995 F.2d 295, 299 (D.C.Cir.1993) (district court "could hardly" have abused its discretion in not sua sponte granting leave to replead when such request only came in opposition papers to motion to dismiss); Song v. City of Elyria, Ohio, 985 F.2d 840, 843 (6th Cir.1993) ("[D]istrict court had no duty to instruct plaintiffs that they had the opportunity to move to amend their complaint.").
 
 
 38
 Moreover, leave to amend may be denied if the amendment would be futile. Foman, 371 U.S. at 182, 83 S.Ct. at 230; Leonelli v. Pennwalt Corp., 887 F.2d 1195, 1198 (2d Cir.1989). Appellants have not indicated how they could satisfy RICO's proximate cause requirement, and it is hardly self-evident that they could transform the facts pleaded into a sufficient allegation of proximate injury to American Express.
 
 
 39
 We therefore affirm.
 
 
 
 [1]
 The complaint alleges that, throughout the existence of the scheme, Cantor kept Freeman updated on her activities. Freeman in turn frequently apprised Robinson of the progress of the defamation campaign. Until spring 1988, Greco's reports were approved and signed by Freeman; after that, they were approved and signed by Smith
 
 
 [2]
 The defendants-appellees argue also that: i) the complaint failed to plead the predicate acts of fraud with particularity, ii) the acts of bribery alleged in the complaint do not qualify as RICO predicate acts, iii) acts of defamation are not mail fraud, iv) the alleged acts of mail and wire fraud fail to satisfy the property requirement of the mail and wire fraud statute, and v) the alleged acts of mail or wire fraud fail because the persons allegedly deceived were not the same as those injured
 
 
 [3]
 Moreover, while the complaint does cursorily assert that American Express was a victim of the RICO defendants' acts and that these acts were the proximate cause of American Express's alleged injuries, these conclusory allegations of the legal status of the defendants' acts need not be accepted as true for the purposes of ruling on a motion to dismiss. See First Nationwide Bank, 27 F.3d at 772 ("[C]ourts do not accept conclusory allegations on the legal effect of the events plaintiff has set out if these allegations do not reasonably follow from his description of what happened.") (quoting Kadar Corp. v. Milbury, 549 F.2d 230, 233 (1st Cir.1977)); Shemtob v. Shearson, Hammill & Co., 448 F.2d 442, 445 (2d Cir.1971)
 
 
 [4]
 Although the complaint alleges, without factual support or details, that Freeman "hated" Safra, and that Cantor "espoused elaborate conspiracy theories, which had little, if any, factual underpinning," there was no allegation that any of the RICO defendants were personally enriched in any manner from their conduct of the alleged RICO scheme