W.L. MENG, et al., Plaintiffs,

v.

Bernard L. SCHWARTZ and Loral Space and Communications, Ltd., et al., Defendants.

No. Civ. 98–2859(RCL).

United States District Court, District of Columbia.

Sept. 25, 2000.

Larry Elliot Klayman, Klayman & Associates, PC, Washington, DC, for plaintiffs.

John Joseph Halloran, Jr., Speiser Krause, Arlington, VA, for Bernard L. Schwartz, defendant.

David Paul Murray, Willkie Farr & Gallagher, Washington, DC, for Loral Space & Comm, defendant.

John Hardin Young, Falls Church, VA, Joseph Eric Sandler, Sandler & Reiff, P.C., Washington, DC, for DNC Serv Corp, dba Democratic National Committee, defendant.

Robert Felix Bauer, Perkins, Coie, LLP, Washington, DC, for Democratic Senatorial Campaign Committee, and Democratic Congressional Campaign Committee, Incorporated, defendant.

David Evan Kendall, Williams & Connolly, Edward Bennett Williams, Washington, DC, for William Jefferson Clinton, and Hillary Rodham Clinton, federal defendants.

Mary Hampton Mason, Department of Justice, Torts Branch, Civil Division, Washington, DC, for Albert Gore, Jr., Harold Ickes, and Alex Herman, Samuel R. Berger, federal defendants.

Stuart Michael Gerson, Epstein, Becker & Green, P.C., Mary Hampton Mason, Washington, DC, for Melissa Moss, federal defendant.

Steven Mark Salky, Zuckerman, Spaeder, Goldstein, Taylor & Kolker, L.L.P., Washington, DC, for Marvin Rosen, federal defendant.

Richard Ben–Veniste, Holly Elizabeth Loiseau, Weil, Gotshal & Manges, L.L.P., Washington, DC, for Terence R. McAuliffe, defendant.

John Christopher Keeney, Jr., Hogan & Hartson, L.L.P., Washington, DC, Ty Cobb, Hogan & Hartson, L.L.P., Denver, CO, for John Huang, defendant.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

Now before the Court are several motions to dismiss a derivative suit filed on November 24, 1998 by W.L. Meng, S.S. Jones, Jr., and Roy and Joan Gillison, all shareholders of Loral Space and Communications, Ltd. ("Loral"). The plaintiffs named over fifteen defendants, among them Loral, its CEO Bernard Schwartz, President Clinton, Vice President Gore, and the Democratic National Committee.[1]

The plaintiffs allege that Schwartz bribed President Clinton and other government officials with campaign contributions in an effort to secure export licenses for Loral products. The plaintiffs claim that this alleged conduct gives rise to five causes of action: (1) breach of fiduciary duty, (2) negligence, (3) unjust enrichment, (4) civil conspiracy, and (5) civil RICO. The defendants all demur, and ask this Court to dismiss the claims pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the Court dismisses the RICO claim and declines to exercise jurisdiction over the remaining claims.

## BACKGROUND

The plaintiffs' allegations in this case chart a course of drama and intrigue. One wonders what proof, if any, may lie behind these charges. But this stage of the proceedings is not designed for determining veracity; rather, it is designed to determine whether the plaintiffs have stated an actionable claim. To do this, the Court

1. Also named in the suit were Hillary Rodham Clinton, Harold Ickes, Melissa Moss, Alexis Herman, Marvin Rosen, Terrence McAuliffe, Samuel Berger, John Huang, the Democratic Senatorial Campaign Committee, the Democratic Congressional Campaign Committee, and John and Jane Does Nos. 1–10.

must "take as true the material facts alleged in the [plaintiffs'] amended complaint." *Hospital Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 740, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976). Thus, in recounting as true many of the plaintiffs' allegations, the Court does not suggest that the allegations are indeed true.

Loral is one the world's top manufacturers of satellites. It is currently in the midst of establishing a global cellular telephone network, known as project "Globalstar." The project requires the placement of 56 satellites in low earth orbit. To this end, Bernard Schwartz, Loral's CEO, contracted with several Chinese launch providers while on a trade mission sponsored by the United States Department of Commerce in August 1994.

Before any launch could take place, Loral needed to obtain a suspension of the Foreign Relations Authorization Act of 1990 and 1991, 22 U.S.C. § 2151 et seq. (1994). The Act, enacted in the wake of Tiananmen square, prohibited the export of U.S. satellites intended for launch in China. The Act provides that the suspension may be lifted on a case by case basis if the President determines that it is in the national interest to do so. On February 6, 1996, President Clinton signed a waiver permitting one of Loral's satellites to be exported. The President did so a second time on February 18, 1998.

Between 1994, when the launch contracts were first signed, and 1998, when the last waiver was signed, Schwartz contributed over $1.4 million of his personal funds to three organizations: the Democratic National Committee, the Democratic Senatorial Campaign Committee, and the Democratic Congressional Campaign Committee. Schwartz was later reimbursed for these expenditures by Loral. The plaintiffs allege that President Clinton and other government officials explicitly agreed to trade export waivers for campaign contributions.

In May 1998, three months after President Clinton signed the second waiver, it was announced that Loral was being investigated by the Department of Justice's Campaign Finance Task Force. Thus began, relatively speaking, a minor political scandal. The *Washington Post* and the *New York Times* each covered the emerging story, while various politicians and Schwartz himself made appearances on the Sunday morning talk show circuit. The scandal gradually faded from the headlines until June 1999, when the House Select Committee on U.S. National Security and Military/Commercial Concerns with the People's Republic of China issued the "Cox Report." The report recounted many of Loral's dealings in the satellite industry and made numerous suggestions of impropriety. In response, Loral took out full page ads in several major newspapers denying any wrongdoing.

Unpersuaded by Loral's denials, the plaintiffs brought suit. In their derivative suit, the plaintiffs seek to have Loral compensated for the harms visited on it by Schwartz, President Clinton, the Democratic National Committee, and the other defendants.

## ANALYSIS

### I. Jurisdiction

The plaintiffs make one federal claim and four state law claims. Section 1331 of title 28 grants this Court jurisdiction over issues of federal law. *See* 28 U.S.C. § 1331 (1994). Further, section 1367 permits this Court to exercise supplemental jurisdiction over nonfederal claims that are "so related" with the original jurisdiction claim as to be "part of the same case or controversy." *See* 28 U.S.C. § 1367(a) (1994). As the state law claims alleged in this case are closely intertwined with the federal claim, all claims are properly before the Court.

### II. Standard for Dismissal under Rule 12(b)(6)

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a defendant's motion for dismissal may be granted if the plaintiff's claim fails "to state a claim upon which relief can be granted." FedR.

Civ.Pro. 12(b)(6). In reviewing a claim, a court should presume the allegations to be true and liberally construe them in favor of the plaintiff. *See Phillips v. Bureau of Prisons,* 591 F.2d 966, 968 (D.C.Cir.1979) (citing *Miree v. DeKalb County, Ga.,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977)). In addition, the plaintiff must be given every favorable inference that may be drawn from his allegations of fact. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). "However, legal conclusions, deductions or opinions couched as factual allegations are not given a presumption of truthfulness." *Wiggins v. Hitchens,* 853 F.Supp. 505, 508 n. 1 (D.D.C.1994) (citing 2A Moore's Federal Practice, S12.07, at 63 (2d ed.1986) (footnote omitted); *Haynesworth v. Miller,* 820 F.2d 1245, 1254 (D.C.Cir.1987)). Finally, dismissal is only appropriate if it appears beyond doubt that no set of facts proffered in support of plaintiff's claim would entitle him to relief. *See EEOC v. St. Francis Xavier Parochial Sch.,* 117 F.3d 621, 624 (D.C.Cir.1997) (citing *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

### III. The Plaintiffs' RICO Claim

The plaintiffs allege that all of the named defendants engaged in a scheme violative of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 (1994). The defendants argue that, even if RICO violations were committed, the violations were not the proximate cause of the plaintiffs' harm. The Court agrees with the defendants and therefore dismisses the RICO claim.

### A. RICO and Proximate Cause

█ The RICO statute creates a private civil action for a person "injured in his business or property by reason of a violation of [18 U.S.C. § 1962]." 18 U.S.C. § 1964 (1994). To state a valid RICO claim, a plaintiff must allege, inter alia, two or more predicate acts that constitute a "pattern of racketeering activity." 18 U.S.C. § 1961. On its face, the RICO statute does not require proximate causation; that is, the statute does not expressly require the "predicate acts" designated in section 1961 to proximately cause the "injury" designated in section 1962. The United States Supreme Court, however, read such a clause into the statute in *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992).

*Holmes* involved a stock manipulation scheme used to inflate the price of several stocks. When the scheme was exposed, the stock prices plummeted, eventually requiring the Securities Investor Protection Corporation ("SIPC") to advance $13 million to several broker-dealers who owned large quantities of the stock. The SIPC sued the scheme's perpetrators under RICO. The Supreme Court rejected the suit, finding that there was no "direct relation between the injury asserted and the injurious conduct alleged." *Holmes,* 503 U.S. at 268, 112 S.Ct. 1311. According to the Supreme Court, cause and effect in the RICO context is not merely a metaphysical connection; rather it is a connection informed by "social policy." [2] *Id.* In taking account of social policy, the Court considered issues such as duplicative recovery, fair apportionment of liability, adequate deterrence. *Id.* at 269, 112 S.Ct. 1311.

Since *Holmes,* the Second Circuit has extensively explored the concept of causation in the RICO context. [3] Its exploration

---

**2.** *See also Moore v. PaineWebber, Inc.,* 189 F.3d 165, 178 (2d Cir.1999) (Calabresi, J., concurring) ("It should not be forgotten ... that the pertinent requirements of proximate cause in a RICO case are those intended by the legislature that passed the statute, and not those of the common law.").

**3.** The Court focuses on the Second Circuit here because it, more than any other circuit, has been prolific in its holdings regarding RICO causation. This should not suggest that the Second Circuit is somehow in a minority among the circuits. It is not. To the extent that similar issues have presented themselves for review, the Second Circuit has been cited

reveals two principles relevant to the instant case. First, proximate causation demands that the plaintiff be the "intended target[ ] of the RICO violation." *American Express*, 39 F.3d 395, 400 (2d Cir. 1994). *American Express* involved the repercussions of a scheme by American Express executives to defame one of its competitors. The scheme backfired, and eventually forced American Express to pay a $10 million settlement. Faced with a shareholders' derivative claim under RICO, the Second Circuit found causation lacking, explaining that

> the shareholders of American Express were certainly not the intended targets of the RICO violations. Quite the contrary, the RICO violations were intended to benefit American Express by injuring one of its competitors.

Id. Since *American Express*, the "intended target" requirement has been repeatedly endorsed.[4] *See Abrahams v. Young & Rubicam, Inc.*, 79 F.3d 234, 239 (2d Cir. 1996), *BCCI Holdings (Luxembourg), Societe Anonyme v. Pharaon*, 43 FSupp.2d 359, 366 (S.D.N.Y.1999); *Medgar Evers Houses Tenants. Association v. Medgar Evers Houses Associates*, 25 F.Supp.2d 116, 122 (S.D.N.Y.1998).

The second lesson gleaned from the Second Circuit RICO cases is a distinction between scheme and scandal. Again

*American Express* is instructive. Had the scheme by the American Express executives remained a secret, the company would have undoubtedly profited. Instead, the scheme was exposed and a scandal ensued, costing the company millions. The Second Circuit declined to find proximate causation, opining that "any losses to American Express were caused ... because the scheme itself was exposed and thus failed." This logic has been affirmed several times. *See Abrahams*, 79 F.3d at 239; *In re Teledyne Defense Contracting Derivative Litigation*, 849 F.Supp. 1369, 1374 (C.D.Cal.1993).

**B. Proximate Causation in the Instant Case**

■ Viewing the plaintiffs' claims against the above precedent, the Court finds that the injuries alleged were not proximately caused by the supposed RICO violations. The circumstances of the case at hand are exceedingly similar to those in *American Express* and its progeny. The alleged bribery by Schwartz was undertaken to benefit Loral by harming its competitors. Nowhere in the plaintiffs' pleading is there a claim that Schwartz sought to harm Loral through his actions. Thus, Loral and its shareholders were not the intended targets of Schwartz' actions.

---

with approval. *See Hamm v. Rhone–Poulenc Rorer Pharmaceuticals, Inc.*, 187 F.3d 941, 952, (8th Cir.1999); *Bivens Gardens Office Building, Inc. v. Barnett Banks of Fla., Inc.*, 140 F.3d 898, 907 (11th Cir.1998); *Khurana v. Innovative Health Care Systems, Inc.*, 130 F.3d 143, 148 (5th Cir.1997); *Kentucky Laborers Dist. Council Health & Welfare Trust Fund v. Hill & Knowlton, Inc.*, 24 F.Supp.2d 755, 768 (W.D.Ky.1998); *In re Teledyne Defense Contracting Derivative Litigation*, 849 F.Supp. 1369, 1374 (C.D.Cal.1993).

4. Recently, Judge Joyce Hens Green, a district court judge on this court, declared that

a defendant's [RICO violations] proximately cause [a] plaintiff's injuries when such acts are a substantial factor in the sequence of responsible causation and where the plaintiff's injury was reasonably forseeable or anticipated as a natural consequence of those acts.

*BCCI Holdings (Luxembourg) Societe Anonyme v. Khalil*, 56 F.Supp.2d 14, 56 (D.D.C.1999). In this Court's opinion, it is mere word-play to assert, as the plaintiffs do, that Judge Green's formulation is substantively different from the "intended target" formulation. Not only did *American Express* phrase the test in both ways (later repeating the "intended target" language in *Abrahams v. Young & Rubicam, Inc.*), but Judge Green cited *American Express* as authority for her formulation of the proximate cause test. *See American Express*, 39 F.3d at 399; *Abrahams v. Young & Rubicam, Inc.*, 79 F.3d 234, 239 (2d Cir.1996); *BCCI Holdings*, 56 F.Supp.2d at 56. Further, one should not be lulled into thinking that the proximate cause test under RICO should be analogous to the "reasonable forseeability" test common to tort law. The Supreme Court, as well as other courts, has made it clear that it is not. *See* note 2 and accompanying text.

Also, the shareholder injury in this case arose as a result of the scandal, not the scheme itself. Indeed, had the scandal never occurred, none of the harm alleged by the plaintiffs would have occurred. The plaintiffs argue that the scandal/scheme distinction is inappropriate because "it obviously is a reasonable, foreseeable, and natural consequence of engaging in any unlawful conduct that the unlawful conduct will be discovered and investigated." Plaintiffs' brief at 10. The Court disagrees.

As public figures, spin doctors, and the press are all aware, scandals often unfold in kaleidoscopic fashion. They are not creatures of order, but of entropy. All sorts of indiscretions lurk in eaves of this nation's capital, yet only a few, through mere circumstance, fall upon the fertile ground of scandal. A briefcase left in a cab; a roommate who works for the wrong agency; a dress that never went to the cleaners. All of these are the sources of scandal and none of them are part of a predictable chain of events. In sum, the origin and development of scandals are inherently unpredictable. Thus, this Court agrees with the Second Circuit that, in RICO cases such as this one, a scandal severs the chain of legal causation.

■ In keeping with the directives of *Holmes*, this Court's decision is also well-grounded in social policy. Denying a RICO claim in this case would not shield the alleged wrongdoers from liability, nor would it prevent the shareholders from seeking other remedies. In both instances, a properly plead derivative action would provide both a penalty for the malfeasant and a remedy for the shareholders. See *Holmes*, 503 U.S. at 269, 112 S.Ct. 1311; *American Express*, 39 F.3d at 401. Further, "granting standing to attenuated and indirect parties" gives rise to the risk of "duplicative recoveries" and "superfluous deterrence." *American Express*, 39 F.3d at 401; *see also Holmes*, 503 U.S. at 269–70, 112 S.Ct. 1311. These factors to-

gether persuade the Court that the RICO claim must be disallowed.

\*    \*    \*    \*    \*    \*

In sum, the Court grants the defendants' motion to dismiss the RICO claim because the plaintiffs' injuries, if any, were not proximately caused by the alleged RICO violations.

## IV. The Plaintiffs' Claim for Breach of Fiduciary Duty, Negligence, Unjust Enrichment, and Civil Conspiracy

■ The plaintiffs alleged five counts in their pleading: four state law claims and one federal claim. Being without diversity of citizenship, the plaintiffs' presence in federal court rests on supplemental jurisdiction, which permits a federal court to extend its jurisdiction to claims properly appended to a claim falling within its original jurisdiction. See 28 U.S.C. § 1367(a) (1994). In the case at hand, the claim falling within this Court's original jurisdiction was the plaintiffs' RICO claim; this claim has now been dismissed. Thus, with the explicit permission of Congress, this Court declines to hear the remaining state law claims. See 28 U.S.C. § 1367(c).

By statute, this Court "may decline to exercise supplemental jurisdiction over a claim ... if (3) the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c) (1994). Accordingly, as the plaintiff's RICO claim has been dismissed, the Court declines jurisdiction over the remaining claims.

Although the Court is not obliged to explain its reasoning in declining jurisdiction, it is worth noting that the remaining claims would require the court to go beyond its usual role in interpreting state law. Loral is incorporated in Bermuda, the law of which is derived chiefly from England. Thus, the issues of demand and corporate duty, which have been briefed by some parties, would require the court to delve into areas substantially beyond its experience or expertise.

**98**

### CONCLUSION

For the forgoing reasons, the Court dismisses the plaintiffs' RICO claim pursuant to Federal Rule of Civil Procedure 12(b)(6) and declines to exercise jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367(c). An order consistent with this holding accompanies this opinion.