**J.S. SERVICE CENTER CORPORATION and Sercenco, S.A., Plaintiffs,**

v.

**GENERAL ELECTRIC TECHNICAL SERVICES COMPANY, INC. and General Electric Company, Defendants.**

No. 95 Civ. 3979 (WCC).

United States District Court,
S.D. New York.

July 17, 1996.

Szold & Brandwen, P.C. (Alan G. Blumberg, Joy Feigenbaum, Martin Bienstock, Linda M. Baldwin, of counsel), New York City, for Plaintiffs.

Kellogg, Huber, Hansen, Todd & Evans (Mark C. Hansen, Jeffrey A. Lamken, Neil M. Gorsuch, of counsel), Washington, DC, General Electric Company (E. Scott Gilbert, James DeVine, Eduardo L. Buso, of counsel), New York City, for Defendants.

### OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiffs J.S. Service Center Corporation and Sercenco, S.A. (collectively, "Sercenco") brought this action against defendants General Electric Technical Services Company, Inc. and General Electric Company (collectively, "GE") asserting claims for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961–68; the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. § 78dd–2; and New York Penal Law; and asserting claims for breach of contract, tortious interference, prima facie tort, unfair competition, and common law fraud.

GE has moved to dismiss the Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief may be granted. For the reasons discussed below, defendants' motion is granted.

### BACKGROUND

The following facts are alleged in the Amended Complaint. On July 1, 1987, Sercenco and GE entered into a Service Sales Representative Agreement (the "Contract"), pursuant to which Sercenco was designated as GE's authorized service sales representative for Peru for the period July 1, 1987 through June 30, 1990.[1] Among other things, the Contract contained provisions for bidding violations of anti-bribery laws such as the FCPA and requiring compliance with GE's written policy against bribing foreign officials to procure sales. In 1991, Sercenco was the sole service sales representative in Peru for GE's International Sales and Construction and Engineering Services and for GE's Generation (Utility), Industrial Transportation, Transportation, Power Delivery (Utility) and Environmental Services components. At that time, Sercenco was party to four other contracts with GE, one of which related to services in Peru and one of which related to services in Venezuela. Each of those contracts contained similar anti-bribery provisions.

Sercenco's problems with GE arose out of events relating to a four-year equipment maintenance agreement that Sercenco had entered into in April 1988 (the "1988 Agreement") with Electricidad del Peru, S.A. ("ElectroPeru"), a government-owned electric utility company located in Peru. The 1988 Agreement did not involve the maintenance or servicing of GE products.

According to the Amended Complaint, in 1990 Sercenco was solicited for a $200,000 bribe by an employee of ElectroPeru acting on behalf of Luis Ampuero Salas ("Ampuero"), the prospective general manager of ElectroPeru. After Sercenco refused to pay, Sercenco was approached again by the same employee and was warned that, if it did not reconsider its position, it would face problems with the new administration of ElectroPeru, including a searching investigation of all of Sercenco's transactions with ElectroPeru. Sercenco again refused to comply with the demand, and ElectroPeru retaliated by claiming that Sercenco had overbilled ElectroPeru by more than $1 million on the 1988 Agreement. As a result, over $1 million in invoiced payables to Sercenco were held back while ElectroPeru's auditors reviewed all of Sercenco's dealings with ElectroPeru. After a lengthy dispute over the alleged overbilling, in December 1990, ElectroPeru agreed in writing to reduce its claims for credits against unpaid invoices from over $1 million to about $25,000. However, Ampuero managed to block the payment of Sercenco's

---

1. The parties subsequently extended the term of the Contract to December 31, 1991.

invoices notwithstanding the signed settlement agreement.

In the spring of 1991, in a move to increase the pressure on Sercenco, Ampuero began lodging fabricated complaints to GE about the quality of service that Sercenco was providing to ElectroPeru. Sercenco and GE conducted numerous telephone conversations and meetings from the spring of 1991 to August 1991 to discuss these complaints. Sercenco informed GE of the demand to pay a bribe to Ampuero, and the great financial pressure Ampuero was exerting on Sercenco to pay the bribe by blocking the payment of Sercenco's invoices. Sercenco underscored the facts that it had done nothing wrong and that Ampuero had demanded a bribe and was merely trying to pressure Sercenco by making untrue allegations about Sercenco to GE. GE repeatedly instructed Sercenco to "resolve" the problem without involving GE, allegedly so that GE could obtain additional contracts for sales of its products to ElectroPeru. Sercenco argues that GE communicated to Sercenco, in so many words, that it had better acquiesce to Ampuero's demand for payment in order to preserve ElectroPeru as a customer of GE products.

Concerned about whether ElectroPeru would continue to purchase parts from GE through Sercenco, GE wrote a letter to Ampuero expressing concern about the "contractual difficulties" between Sercenco and ElectroPeru. Ampuero responded that ElectroPeru would not accept any services or supply from Sercenco during the pendency of their contractual dispute. Sercenco alleges that this dialogue between GE and Ampuero was staged in order to put pressure on Sercenco to pay Ampuero's extortionate demand. GE then issued a letter to Sercenco, dated September 13, 1991, which instructed Sercenco to terminate any commercial activity on behalf of GE with ElectroPeru, due to the ongoing contractual dispute between ElectroPeru and Sercenco, unless and until the matter was "satisfactorily resolved." Sercenco interpreted this correspondence as a statement to Sercenco that it would have to pay the bribe that Ampuero demanded if it wanted to retain its position as GE's service sales representative and retain the ElectroPeru account. GE then advised Ampuero by letter dated September 20, 1991 that it had suspended the Contract with Sercenco relating to the furnishing of equipment and services to ElectroPeru. Ampuero distributed copies of this letter to many government entities that were clients or potential clients of Sercenco allegedly in an attempt to damage Sercenco's business and reputation. Finally, on January 7, 1992, GE sent a letter to Sercenco indicating that GE had decided not to renew the Contract which had expired by its own terms on December 31, 1991, as well as three other agreements relating to services provided in Peru and one other agreement relating to services provided in Venezuela. Sercenco's pleas for reconsideration fell on deaf ears; GE replaced Sercenco with an affiliate of Sumitomo as its service sales representative in Peru. Sercenco alleges that GE selected Sumitomo because GE knew that Sumitomo, a Japanese company not subject to the provisions of the FCPA, had a history of paying bribes to officials of government-owned or government-controlled companies in exchange for contracts, and would continue doing so.

Ultimately, Sercenco commenced a suit against ElectroPeru for all sums due under the 1988 Agreement. While the litigation was pending, for reasons unrelated to the dispute between Sercenco and ElectroPeru, Ampuero was suspended in July 1993 and eventually discharged on November 1, 1993. On July 15, 1994, the Supreme Court of Peru affirmed the lower court judgments in favor of Sercenco against ElectroPeru modifying them to a judgment in favor of Sercenco and against ElectroPeru in the aggregate amount of over $9 million.

According to Sercenco, the pressure that GE exerted on it with respect to Ampuero's demand to pay him a bribe is just one example of GE's unlawful contract procurement practice. Sercenco alleges that GE's practice of condoning and facilitating the payment of bribes by sales representatives extends beyond Peru and Latin America. Sercenco identifies two high profile incidents, one in Israel where GE pleaded guilty to felony counts for violation of the

FCPA based on unlawful payments to foreign officials in connection with defense contracts, and one in Korea where it was reported that GE made payments through a retired South Korean general to pay off Korean officials in return for contract awards. Sercenco alleges that it sustained monetary damage as the direct and proximate result of GE's practice of (1) obtaining contracts for sales of GE products through unlawful means, including bribery, extortion, and other fraudulent procurement practices; (2) insisting upon having distributors and sales representatives who would cooperate with them in such unlawful activities; (3) at times conspiring with dishonest officials and representatives of defendants' customers who engaged in such unlawful acts to coerce defendants' distributors and sales representatives to engage in such unlawful acts; and (4) replacing Sercenco with Sumitomo as its sales representative. Am.Compl. ¶ 97.

In sum, Sercenco alleges that GE engaged in various schemes effectuated through the use of the United States mails and interstate and foreign wires and by travel in interstate and/or foreign commerce to obtain and maintain contracts for the sale of its products in Latin America and throughout the world by misrepresenting its strict adherence to, and its requirement that sales representatives adhere to, anti-bribery statutes; inducing sales representatives to enter into contracts to market GE products and then coercing them into violating anti-bribery statutes while insulating GE from liability; replacing service sales representatives that were unwilling to pay bribes with representatives that GE knew had previously paid bribes and were willing to continue doing so; secretly participating in unlawful procurement practices along with service sales representatives, and dishonest officials and GE employees; and committing fraud on GE customers by deceiving them as to the true price of GE products. Am.Compl. ¶ 11. According to Sercenco, in furtherance of GE's schemes to increase its sales through bribery and extortion, GE attempted to induce and coerce Sercenco into paying an extortionate demand by Ampuero, an official of one of GE's customers in Peru; when Sercenco refused to accede to GE's demand to pay the bribe, GE terminated Sercenco's contractual rights to represent GE before ElectroPeru, the company in Peru that employed Ampuero, and thereafter refused to renew any contract with Sercenco upon expiration; GE terminated Sercenco's rights and refused to renew Sercenco's contracts with the intention of replacing Sercenco with a representative that was not subject to anti-bribery statutes and that GE knew was willing to pay bribes without implicating GE; and GE did in fact replace Sercenco for such purpose and with the intention of encouraging and facilitating the payment of bribes by such representative. Am.Compl. ¶ 12. Sercenco alleges that GE's actions in furtherance of its scheme to increase sales of GE products through bribery, extortion, unlawful and/or fraudulent procurement practices and other fraudulent and unlawful means were violations of RICO, the FCPA, the Travel Act, the Hobbs Act, and the federal mail and wire fraud statutes. Am.Compl. ¶ 13.

### DISCUSSION

A complaint should not be dismissed under Fed.R.Civ.P. 12(b)(6) unless it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle it to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Goldman v. Belden,* 754 F.2d 1059, 1065 (2d Cir.1985). On a motion to dismiss, a court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). However, the Supreme Court has instructed that we need not "accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 2944, 92 L.Ed.2d 209 (1986). Also, " 'baldly conclusory' statements that are unsupported by any factual basis" cannot be relied upon to defeat a motion to dismiss. *Haviland v. J. Aron & Co.,* 796 F.Supp. 95, 97 (S.D.N.Y.), *aff'd,* 986 F.2d 499 (2d Cir.1992), *cert. denied,* 507 U.S. 1051, 113 S.Ct. 1945, 123 L.Ed.2d 650 (1993). Therefore, we look beyond the conclusory

assertions in the complaint and examine the factual basis of plaintiffs' claims.

## I. RICO

■ To establish a civil RICO claim, Sercenco must plead (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex, Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985); *Moss v. Morgan Stanley Inc.,* 719 F.2d 5, 17 (2d Cir.1983), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984). GE argues that Sercenco's RICO claim must be dismissed because the claimed "enterprises" are not cognizable under RICO and the alleged six-month "scheme" to pressure Sercenco to pay Ampuero's demand cannot meet RICO's "pattern" requirement. In addition, GE argues that Sercenco lacks standing because the alleged injuries suffered by Sercenco were not a direct and proximate result of the predicate acts upon which the RICO claim is based. Because we agree that Sercenco lacks standing to assert a RICO claim based on the allegations in the Amended Complaint, we need not reach GE's arguments that Sercenco has failed to allege an "enterprise" or a "pattern."

■ In a "suit on a statute" (i.e., a suit in which the statute itself grants the recovery, creates the jurisdiction, or permits special damages) such as RICO, the plaintiff must show both that he is within the class the statute sought to protect and that the harm done was one that the statute was meant to prevent. *Abrahams v. Young & Rubicam Inc.,* 79 F.3d 234, 237 (2d Cir.), *petition for cert. filed,* 64 U.S.L.W. 3823 (U.S. May 29, 1996) (No. 95–1932). Under section 1964(c) of RICO, "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." 18 U.S.C.A. § 1964(c) (West Supp.1996). Section 1962(c)

provides in relevant part that "[i]t shall be unlawful for any person ... associated with any enterprise engaged in ... interstate or foreign commerce[ ] to conduct or participate, directly or directly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...." 18 U.S.C. § 1962(c). Furthermore subsection (d) of section 1962 provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C.A. § 1962(d) (West Supp.1996). Acts constituting "racketeering activity" are enumerated in section 1961. *See* 18 U.S.C.A. § 1961(1) (West Supp. 1996).

■ In *Sedima,* the Supreme Court held that a "plaintiff only has standing [under RICO] if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." 473 U.S. at 496, 105 S.Ct. at 3285. That is, "the compensable injury necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise." *Id.* at 497, 105 S.Ct. at 3285. Accordingly, in order to establish standing, Sercenco must show that the damage to its business or property resulted from the alleged predicate acts constituting the RICO violation in this case. A careful review of Sercenco's amended complaint demonstrates that it cannot meet this requirement.

■ Sercenco's Amended Complaint, distilled to its core, alleges that racketeering conduct violating section 1962 caused it injury in the form of lost business because of GE's breach of, and subsequent refusal to renew, the Contract. Sercenco holds GE responsible for supporting and facilitating a world-wide practice of bribery, and then penalizing Sercenco for refusing to participate in the scheme. Sercenco contends that GE's fraudulent practice of procuring contracts through bribery not only damaged GE's competitors and the government and taxpayers of Peru, but also interfered with Sercenco's ability to comply with its obligation not to engage in bribery—an obligation which arose

out of its Contract with GE as well as anti-bribery statutes such as the FCPA.

We conclude that this type of harm is too remotely related to the predicate acts alleged to support a claim under RICO. " 'A defendant who violates section 1962 is not liable for treble damages to everyone he might have injured by other conduct,' but only to anyone whose injuries were caused ' "by reason of" a violation of section 1962.' " *Sperber v. Boesky,* 849 F.2d 60, 64 (2d Cir.1988) (citing *Haroco, Inc. v. American Nat'l Bank and Trust Co. of Chicago,* 747 F.2d 384, 398 (7th Cir.1984), *aff'd,* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985) (per curiam)). "[T]his 'by reason of' language ... imposes a proximate cause requirement on plaintiffs." *Haroco,* 747 F.2d at 398.

The alleged scheme to secure contracts through bribery and extortion may constitute "racketeering activity" sufficient to trigger RICO liability. *See* 18 U.S.C.A. § 1961(1) (West Supp.1996) (" '[R]acketeering activity' means ... any act which is indictable under ... title 18 ... section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), ... section 1951 [the Hobbs Act] (relating to interference with commerce, robbery, or extortion), section 1952 [the Travel Act] (relating to racketeering)...."). [2] However, the Second Circuit has held that loss of employment for refusing to participate in an enterprise engaging in a pattern of racketeering activity is not injury sufficient to confer standing. *See Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21 (2d Cir.1990) (no standing for discharged employee alleging loss of employment and commissions resulting from his refusal to cooperate in employer's mail and wire fraud scheme); *Norman v. Niagara Mohawk Power Corp.,* 873 F.2d 634 (2d Cir.1989) (no standing for employee claiming harassment in retaliation for blowing the whistle on employer's violations of the Energy Reorganization Act); *Burdick v. American Express Co.,* 865 F.2d 527 (2d Cir.1989) (no standing for a stockbroker who allegedly was discharged for complaining about his employer's acts of mail and securi-

ties fraud) (per curiam); *see also Haviland,* 796 F.Supp. 95 (no standing for futures broker claiming that he was terminated for refusing to cooperate in mail and wire fraud scheme conducted by employer and employer's affiliate); *Miller v. Helmsley,* 745 F.Supp. 932 (S.D.N.Y.1990) (no standing for former president of brokerage firm claiming loss of salary and commission as well as forced resignation resulting from employer's predicate acts of extortion, mail fraud, and wire fraud); *Giuffre v. Metropolitan Life Ins. Co.,* 129 F.R.D. 71 (S.D.N.Y.1989) (no standing for employee whose termination was the alleged "outcome" of scheme to defraud employer's customers). Sercenco's claim that GE breached and later terminated its Contract because Sercenco refused to participate in GE's scheme to procure contracts through bribery of foreign officials falls squarely within this line of cases.

The starting point for all of these "refusal to cooperate" decisions is the recognition that in order to have standing under RICO, a plaintiff must demonstrate that the harm he suffered is the *direct* result of a predicate act or the alleged pattern of racketeering activity. *Haviland,* 796 F.Supp. at 98. Many of the conclusions that the plaintiff lacked standing, therefore, were grounded on the determination that the alleged RICO violations were aimed at someone other than the plaintiff or that the asserted injury was too "remote" to be attributed to them. *Id.*

In *Burdick,* for example, the plaintiff claimed to have been fired by his defendant-employer after protesting and refusing to participate in the employer's allegedly fraudulent activities. In response to Burdick's contention that the frauds had injured *him* by "interfer[ing] with [his] ability to service his customers, keep them happy and earn a living for himself," the Court nonetheless rejected this attempt to establish standing: "[T]his type of harm is simply too remotely related to the predicate acts of mail and securities fraud to support a claim under RICO." 865 F.2d at 529. The Court also rejected Burdick's claim that he was dis-

**2.** Sercenco alleges that GE committed acts that violate and are indictable under 18 U.S.C. § 1952 (the Travel Act); 18 U.S.C. § 1951 (the Hobbs Act); 18 U.S.C. § 1341 (mail fraud); and 18 U.S.C. § 1343 (wire fraud). *See* Am.Compl. ¶¶ 104, 105, 106, 107.

charged "as a result of" his complaints concerning the defendant's fraudulent activities. The Court reasoned that any injury to Burdick's business or property flowed from the defendant's decision to fire him, rather than from the pattern of racketeering activity in which the defendant engaged. *Id.* (citing *Nodine v. Textron, Inc.,* 819 F.2d 347, 349 (1st Cir.1987)). As to Burdick's claim that he was discharged as "an integral part of the illegal scheme, rather than in retaliation for reporting it," the Court held that any differentiation between "preventive" and "retaliatory" dismissals would serve no useful purposes in this context. 865 F.2d at 529–30 (citing *Pujol v. Shearson/American Express, Inc.,* 829 F.2d 1201, 1205 (1st Cir.1987)).

In *Hecht,* similarly, the plaintiff argued that because he refused to cooperate in the concealment of his employer's frauds upon the company's customer, he lost commissions as well as his job. Turning first to Hecht's claim that the racketeering conduct caused him to lose commissions, which was apparently pleaded in an attempt to differentiate the case from the line of cases declining to find standing for discharged employees, *see* 897 F.2d at 24 n. 2, the Second Circuit stated:

> This injury is too speculative to confer standing, because Hecht only alleges that he would have lost commissions in the future, and not that he has lost any yet. *Even assuming that Hecht actually lost commissions, we hold that his injury was not proximately caused by violations of section 1962(c).*

897 F.2d at 24 (emphasis added). That holding was based on the observation that because Hecht was " 'neither the target of the racketeering enterprise nor the competitor[ ] nor the customer[ ] of the racketeer[s],' ... the injury to Hecht from customers' deciding to cancel subscriptions or to withdraw business upon discovering the frauds was not reasonably foreseeable as a natural consequence of the RICO violations." *Id.* (quoting *Sperber,* 849 F.2d at 65).

The Court next addressed Hecht's claim that his discharge was an overt act in furtherance of the alleged RICO conspiracy, and that his injury was therefore the direct result of the defendants' violation of 18 U.S.C. § 1962(d). Rejecting Hecht's argument that he had standing to assert this violation even in the absence of standing to assert the substantive violation, the Court explained:

> [S]tanding may be founded only upon injury from overt acts that are also section 1961 predicate acts, and not upon any and all overt acts furthering a RICO conspiracy.... Because the overt act of Hecht's discharge was not a section 1961(1) predicate act, his loss of employment does not confer civil standing.

*Id.* at 25 (citation omitted).

In the instant case, Sercenco alleges that GE, through various enterprises, committed acts of extortion, bribery, mail and wire fraud, and racketeering in violation of 18 U.S.C. §§ 1341, 1343, 1951, 1952, and state law. These violations are based on (1) an alleged global scheme to secure business through bribery, resulting in fraud on purchasers of GE's products through inflated prices, and (2) misrepresentations made by GE to Sercenco regarding GE's commitment to comply with the FCPA and GE's expectation that Sercenco comply with the FCPA and other anti-bribery laws. Sercenco alleges that, at the time GE and Sercenco entered into the Contract, GE fraudulently misrepresented to Sercenco that it was committed to comply with the FCPA and that it expected Sercenco to comply with the FCPA and other anti-bribery laws, when in fact GE had no intention of complying with the FCPA and in fact later committed extortion by pressuring Sercenco to violate the FCPA by paying a bribe, and then punished Sercenco for failing to succumb to the extortionate pressure to violate the FCPA by terminating the Contract and refusing to renew the Contract upon its expiration. Sercenco contends that this scheme to defraud deprived it of the opportunity to represent GE in Peru and other Latin American countries and resulted in lost business opportunities.

*Hecht* and *Burdick* teach that Sercenco can only establish standing by demonstrating that the predicate acts of bribery, extortion, or mail or wire fraud *directly* deprived it of business. However, those proximately injured by GE's alleged scheme would have

been competitors of GE (through lost business) or purchasers of GE's products (through inflated prices to pay for the bribes). Although Sercenco alleges and argues that GE terminated its Contract as a necessary step in carrying out the scheme to procure contracts by bribing foreign officials, we conclude that Sercenco's alleged injury was not a proximate result of the alleged racketeering activity. Rather, that injury was directly and proximately caused by Sercenco's discharge as GE's sales representative—which is not a predicate act under section 1961(1), as *Hecht* requires. 897 F.2d at 25. Assuming the truth of Sercenco's allegations, GE's decision to terminate Sercenco "under these circumstances was wrong, but it did not violate the RICO Act." *Burdick,* 865 F.2d at 529 (quoting *Nodine,* 819 F.2d at 349). Accordingly, Sercenco's loss of its Contract to sell and service GE products in Peru does not confer civil standing under RICO.

In arguing that these allegations are sufficient to confer standing, Sercenco does not take issue with the "refusal to cooperate" line of cases typified by *Hecht* and *Burdick.* Instead, Sercenco attempts to distinguish their holdings on grounds that (1) those cases involved termination of an employee, not the termination of a distributor and (2) the unlawful schemes alleged in those cases were directed at persons or entities other than the plaintiff, whereas this alleged scheme to defraud was directed at Sercenco. Neither argument is persuasive.

First, *Abrahams, supra,* refutes Sercenco's argument that the *Hecht* line of cases should be limited to *employees* suing employers under RICO. This recent Second Circuit case clearly articulates the causation requirement that plaintiffs must satisfy for standing under RICO:

> [L]iability, although discussed under the rubric of causation, does not turn on the existence of factual, but-for causation. Nor does it depend on whether there is proximate causation as that term is used at common law. At common law, so long as the plaintiff category is foreseeable, there is no requirement that the risk of injury to the plaintiff, and the risk of the harm that

actually occurred, were what made the defendant's actions wrongful in the first place. With statutory claims, the issue is, instead, one of statutory intent: was the plaintiff (even though foreseeably injured) in the category the statute meant to protect, and was the harm that occurred (again, even if foreseeable), the "mischief" the statute sought to avoid....

*Abrahams,* 79 F.3d at 237. In that case, plaintiff Abrahams was once the Minister of Tourism and Information for the Government of Jamaica, and he had a private consulting business and other business interests. Defendant Young & Rubicam ("Y & R"), an advertising firm, allegedly embarked on a scheme to bribe Abrahams in order to secure the Jamaican Tourist Board advertising account. Abrahams, although the target of Y & R's bribery scheme, was never involved in the scheme, and never received any bribe money. Abrahams learned of the scheme only when he, Y & R, and others were indicted in the District of Connecticut. Y & R pleaded guilty under the FCPA to one count of conspiracy to bribe foreign officials. The government dropped charges against Abrahams after Y & R conceded that there was no evidence that any of the money it paid ever actually went to Abrahams. Abrahams then brought an action claiming injuries to his reputation and to his emotional, financial, political, and social status resulting from widespread public dissemination of false information about his role in the bribery scheme. He also sought damages for the resultant destruction of his consulting business and other business interests. Although Abrahams was never employed by Y & R, the Court held that "[t]he relationship between the predicate acts and Abrahams's injuries is analogous to that of other RICO plaintiffs to whom we have denied relief." *Abrahams,* 79 F.3d at 238 (citing *In re American Express Co. Shareholder Litigation,* 39 F.3d 395, 400 (2d Cir.1994); *Hecht,* 897 F.2d at 24; *Sperber,* 849 F.2d at 64–65). *See also Rand v. Anaconda–Ericsson, Inc.,* 794 F.2d 843, 849 (2d Cir.) (Shareholders of corporation lack standing to assert RICO claim against corporation's creditors on behalf of corporation.), *cert. denied,* 479 U.S.

987, 107 S.Ct. 579, 93 L.Ed.2d 582 (1986). The *Abrahams* Court reasoned as follows:

> Abrahams's failure to establish a RICO claim stems from the fact that he was not "the target of the racketeering enterprise." *American Express,* 39 F.3d at 399 (quoting *Sperber,* 849 F.2d at 65); *see also Hecht,* 897 F.2d at 24. That is to say, Abrahams's injuries did not flow from the harms that the predicate acts—bribery, kickbacks, extortion, fraud—were intended to cause and the laws against them were intended to prevent. *See* PROSSER & KEETON § 36, at 224–25. The Y & R scheme was designed to corrupt the process by which the JTB advertising contract was let and to disadvantage Y & R's rivals for that contract. The laws in question were designed to prevent such conduct. Abrahams was neither an intended target of the scheme nor an intended beneficiary of the laws prohibiting it.

*Abrahams,* 79 F.3d at 238. This holding rejects Sercenco's attempt to avoid the effect of the "refusal to cooperate" cases based on the fact that these cases were brought by employees, and not by distributors such as Sercenco. *See In re American Express Co. Shareholder Litigation,* 39 F.3d 395 (2d Cir. 1994) (Plaintiff shareholders of American Express lack standing to assert RICO claim against present and former officers, directors and employees of American Express because plaintiffs were not the targets of the RICO violations).

Sercenco's attempt to cast itself as the direct target of GE's racketeering activity, for the purpose of distinguishing itself from plaintiffs in other "refusal to cooperate" cases, is also unpersuasive. The facts alleged in the Amended Complaint fail to support Sercenco's conclusory allegation that it was the target of GE's racketeering activity. Sercenco argues that in *Terminate Control Corp. v. Horowitz,* 28 F.3d 1335 (2d Cir. 1994), the Second Circuit distinguished the retaliatory discharge of an employee from a case in which an independent company was subject to extortion: "The facts here are obviously distinct from those that led to a different result in *Hecht,* where the dismissed allegations made it clear that the

plaintiff was not a target of the § 1962(d) conspiracy, but happened upon knowledge of the conspiracy, and was discharged for threatening to disclose it." 28 F.3d at 1346. However, the facts of *Terminate Control* were distinct from those of *Hecht* because the plaintiff in *Terminate Control,* unlike the plaintiff in *Hecht,* was a direct target of a scheme to extort kickbacks from contractors who had succeeded in securing projects from the New York City Board of Education Division of School Buildings ("DSB"). Defendants in that case were individuals employed by the DSB who had conspired to and did extort kickbacks from contractors who had won contracting bids. The issue whether plaintiff was the direct target of defendants' predicate acts, and therefore had standing to sue, was not disputed.

Here, Sercenco fails to allege facts from which one could reasonably conclude that it was a direct target of any racketeering activity conducted by GE. Assuming, as we must, that a fraudulent scheme to procure contracts by bribing foreign officials existed, the scheme was directed to potential customers of GE products. *See Burdick,* 865 F.2d at 529 (Any injury to defendant's *customers*—who were the intended victims of defendant's alleged mail and securities frauds—could not be used to satisfy the requirement that plaintiff "show that the damage to his business or property resulted from the ... fraud."). Conclusory allegations to the contrary that are unsupported by any factual basis cannot defeat a motion to dismiss. *Papasan,* 478 U.S. at 286, 106 S.Ct. at 2944–45; *Haviland,* 796 F.Supp. at 97. Indeed, any attempt to draft the RICO claim "in a conscious attempt to plead around the holdings of the 'refusal to cooperate' cases," *Haviland,* 796 F.Supp. at 101, will not avail Sercenco. We find Sercenco's allegation that it was penalized for refusing to pay a bribe in order to secure a contract for the sale of GE products (or to maintain good relations with a customer of GE products) to be indistinguishable from other plaintiffs' claims that they were penalized for refusing to join in an unlawful scheme. *Id.* In short, we are unpersuaded by Sercenco's conclusory allegations and arguments that it was the direct target of GE's scheme to procure contracts

by bribery of foreign officials. Other courts addressing the standing issue have similarly scrutinized plaintiffs' claims that they were the "true" targets of racketeering activities.

In *Burdick*, for example, the Second Circuit rejected the plaintiff's attempt to allege a more proximate injury by claiming that he was discharged as "an integral part of the illegal scheme, rather than in retaliation for reporting it." *Burdick*, 865 F.2d at 529. Instead, the Court found that a distinction between "preventive" and "retaliatory" discharge would serve no useful purpose in the standing context, since in either instance the injury to a plaintiff flows from the employer's decision to fire the employee rather than the predicate racketeering activity. *Id.* at 529–30. In *Norman*, similarly, the Second Circuit found that the plaintiffs lacked standing to assert their claims of retaliatory harassment because of a lack of "a causal connection between the prohibited conduct and plaintiff's injury," despite their efforts to allege a proximate injury by attempting "to make themselves victims of [the defendant's] scheme by alleging that [defendant] 'intend[ed] to ruin' anyone who, through the faithful performance of his duties, threatened [defendant's] ability to hide the true state of affairs." *Norman*, 873 F.2d at 636. In *Miller*, the plaintiff went so far as to allege a "Fraudulent Scheme Against Miller." The Court rejected this transparent attempt to establish standing, finding that Miller's conclusory self-description as the target of the frauds could not defeat the fact that his employer was the direct target of the racketeering activity and any injury Miller suffered in the form of lost commissions or salary would have "trickled down" indirectly. *Miller*, 745 F.Supp. at 938.

In sum, Sercenco's claimed injury—the loss of its distributorship—was only a by-product of the alleged scheme to secure contracts through bribery of foreign officials. The intended victim of this supposed scheme was not Sercenco but ElectroPeru or ElectroPeru's customers (either or both of which presumably would pay inflated prices), or GE's competitors (who would lose sales to GE). Sercenco's alleged injury directly and proximately resulted from GE's overt act of terminating the Contract, not GE's alleged racketeering activity. Therefore, Sercenco's injuries are too remote from the RICO violations to be deemed "proximate," and it lacks standing to pursue them under the RICO statute.

■ GE has moved to dismiss the claims asserted in the Amended Complaint with prejudice on grounds that Sercenco already has had an opportunity to amend the complaint, and further amendment would be futile. The Federal Rules instruct that a court shall "freely" grant leave to replead "when justice so requires." Fed.R.Civ.P. 15(a); *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). However, the Second Circuit has held that leave to amend need not be given if it would be futile for the district court to permit amendment. *See Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir.1993) (per curiam); *Cortec Indus. v. Sum Holding L.P.*, 949 F.2d 42, 50 (2d Cir.1991), *cert. denied*, 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992); *Health–Chem Corp. v. Baker*, 915 F.2d 805, 810 (2d Cir.1990). Also, dismissal with prejudice is proper when a complaint previously has been amended. *Landy v. Heller, White & Co.*, 783 F.Supp. 125, 133 (S.D.N.Y.1991). In response to GE's request that we dismiss with prejudice, Sercenco argues that the issue of whether the court should grant leave to further amend can only be intelligently addressed in light of the grounds on which the decision is based and the allegations, if any, that could be added to cure the defects in the complaint. Taking this position, Sercenco seeks deferment of consideration of whether the court should grant leave to amend further pending the outcome of this decision. However, we conclude that any attempt to replead the RICO claim based on GE's alleged fraudulent scheme to procure contracts through bribery of foreign officials would be futile because Sercenco cannot escape the preclusive effect of the "refusal to cooperate" line of cases typified by *Hecht*. Therefore, we see no reason to defer the amendment issue. Accordingly, the RICO claim is dismissed with prejudice.

## II.  Foreign Corrupt Practices Act

▮     The FCPA, a criminal statute that prohibits domestic concerns from bribing foreign officials to assist such concerns in obtaining business, *see* 15 U.S.C.A. § 78dd–2(a)(1) (West Supp.1996), provides no explicit private right of action.  Sercenco argues that the FCPA should be construed to provide an implied *private right of action for* a sales representative that is subjected to coercion and extortion by a manufacturer pressuring it to commit violations of the FCPA.

▮     In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant:

> First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted," [i.e.,] does the statute create a federal right in favor of the plaintiff?  Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?  ... Third, is it consistent with the underlying purpose of the legislative scheme to imply such a remedy for the plaintiff?  ... And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975) (emphasis in original) (citations omitted).  Although the question has not been answered yet by the Second Circuit, the few courts that have addressed the issue, applying the four-part *Cort* test, have concluded that no private right of action should be implied under the FCPA.  *See Citicorp Int'l Trading Co. v. Western Oil & Refining Co.,* 771 F.Supp. 600, 606–07 (S.D.N.Y.1991) ("[N]o private right of action exists under the FCPA."); *Lamb v. Phillip Morris, Inc.,* 915 F.2d 1024, 1027–30 (6th Cir.1990) ("[N]one of the *Cort* factors supports ... private right of action theory...."), *cert. denied,* 498 U.S. 1086, 111 S.Ct. 961, 112 L.Ed.2d 1048 (1991); *McLean v. International Harvester Co.,* 817 F.2d 1214, 1219 (5th Cir.1987) (holding that neither the language nor the legislative history of the FCPA indicates the congressional intent to create a private right of action).

Applying the four-part *Cort* test below, we also decline to infer a private right of action under the FCPA.

With respect to the first factor, the FCPA primarily is intended to prevent bribery of foreign officials and to protect businesses from having competitors gain an advantage by offering such bribes.  *Citicorp,* 771 F.Supp. at 606.  Sercenco claims that GE violated the FCPA by bribing (or conspiring to bribe) foreign officials in order to secure business; however, it cannot be said that Sercenco, a distributor of GE (not its competitor), falls within the group for whose particular protection the FCPA was enacted.  Furthermore, although Sercenco argues that it suffered injury for refusing to cooperate in GE's alleged scheme to secure business through bribery, this injury is too remote to place Sercenco within the group for whose "especial" benefit the FCPA was enacted.

As for the second factor, Sercenco identifies no legislative history indicating an intent to create a private right of action.  The Ninth Circuit inferred, based in part on the absence of any mention of a private right of action in the conference report accompanying the final compromise bill passed by both Houses of Congress, "that Congress intended no such result."  *Lamb,* 915 F.2d at 1029.  We concur with *Lamb* 's analysis.  *See Citicorp,* 771 F.Supp. at 607 (following *Lamb* with respect to the second factor).

Sercenco asserts in conclusory fashion that "[t]he critical component of the four-part test for the purposes of this motion is the third component—'whether creation of a private right would be consistent with the underlying purpose of the legislation....'"  Plaintiffs' Memorandum of Law in Opposition, at 59.  Sercenco argues that it is essential to the underlying purpose of the FCPA that a distributor have recourse to a civil damages remedy under the FCPA when the distributor is pressured by a manufacturer to commit violations of the FCPA because manufacturers insulate themselves from the FCPA by tacitly coercing their distributors to pay bribes (and terminating distributors who refuse to give in to manufacturers' pressure to pay the bribes on their behalf).  According to Sercenco, "[i]f the distributor stands up to

the manufacturer's pressure, it risks loss of its distributorship." Plaintiffs' Memorandum in of Law in Opposition, at 60.

As an initial matter, it is not clear that a manufacturer who truly coerces a distributor to pay a bribe in order to secure orders on its behalf has insulated itself from criminal liability under the FCPA. Furthermore, because subsections (e) and (f) of section 78dd–2 "evince[ ] a preference for compliance in lieu of prosecution, the introduction of private plaintiffs interested solely in post-violation enforcement, rather than pre-violation compliance, most assuredly would hinder congressional efforts to protect companies and their employees concerned about FCPA liability." *Lamb*, 915 F.2d at 1029–30. *See Citicorp*, 771 F.Supp. at 607 (following *Lamb* with respect to the third factor). We therefore conclude that the overall legislative scheme is at odds with an implied private right of action.

As for the fourth and final factor, regulation of bribery directed at foreign officials cannot be characterized as a matter traditionally relegated to state control. *Lamb*, 915 F.2d at 1030. In this respect, implying a private right of action under the FCPA—a statutory scheme aimed at activities ordinarily undertaken abroad—would not intrude upon matters of state concern. *Id.* However, Sercenco is not without alternative avenues to pursue its claims against GE: Sercenco can seek redress for its alleged injuries under one or more of the various state law claims asserted in the Amended Complaint.

Based on consideration of the four factors enumerated in *Cort*, we conclude, as has every other court that has addressed this issue, that no private right of action exists under the FCPA.

Sercenco's arguments in support of a contrary position are unconvincing. Sercenco urges the court to adopt the position that Congress enacted the FCPA for the "especial" benefit of distributors who are placed between a rock and a hard place by manufacturers who extort them into paying bribes in violation of the FCPA to procure orders without implicating the manufacturers. Sercenco has identified no authority in support of this fanciful reading of the FCPA, and has

failed to refute or distinguish the well-reasoned cases that have repudiated the notion of an implied private right of action under the FCPA.

For the same reasons that we dismiss the RICO claim with prejudice, we dismiss also the FCPA claim with prejudice.

### III. State Law Claims

Because we dismiss both federal claims asserted in the Amended Complaint, we decline to exercise supplemental jurisdiction over the state law claims. *See* 28 U.S.C. § 1367(c)(3); *Morse v. University of Vermont*, 973 F.2d 122, 127 (2d Cir.1992).

### *CONCLUSION*

For the foregoing reasons, defendants' motion to dismiss is granted. The RICO and FCPA claims are dismissed with prejudice. The remaining claims, arising under state law, are dismissed without prejudice.

SO ORDERED.